THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ALBERT M. HAYES, Defendant-Appellant.

First District (5th Division)   No. 86—0738

Opinion filed March 31, 1988.

PINCHAM, J., dissenting.

Steven Clark and Donna Finch, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., and Patricia Y. Brown, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MURRAY delivered the opinion of the court:

Following a jury trial defendant was convicted of armed robbery and sentenced to a six-year term. On appeal defendant contends that reversible error occurred when evidence of his alleged unrelated criminal activity was presented and that evidence of the complainants'

nonidentification of other individuals as the robber was improper.

The armed robbery occurred about 8 p.m. on February 3, 1984, in a grocery store located at a shopping plaza in Chicago Heights, Illinois. At that time Linda Malito and Cheryl Markiewcz (nee Pitrowski) were working in the store office, which also had a service desk and was located near the front of the store. A man approached the desk and spoke briefly to Markiewcz.

According to Malito she then went to the service desk window to speak to the man whom she positively identified as defendant. At this point defendant produced a silver-colored gun and a bag, in which she then put $800. Defendant took the bag, moved away a short distance, looked inside the bag and announced "You've got to have more money than this. I want more money." When Malito replied that she did not, defendant left the store.

Malito indicated that the incident took no more than two minutes. She said that defendant was wearing a bulky green military jacket, was clean-shaven and had a receding hair line.

That evening Malito and Markiewcz went to the police station, but they did not see their assailant's picture in photo books shown to them there. Both she and Markiewcz then assisted police in preparing a composite sketch of the gunman. About three months after the robbery, the police showed Malito a group of photographs, and she selected defendant's picture. She then viewed a lineup, which included defendant, and selected him as the robber.

Cheryl Markiewcz testified that she was in the office enclosure balancing the register receipts from the store during a "slow night" when defendant approached the service desk. She looked over to him and asked if she could assist him. Linda Malito, who was nearby, then went to the service window to speak to defendant. When she heard defendant tell Malito to "[p]ut all the money in the bag," she looked again at defendant, who was about six feet away, and she saw that defendant was holding a gun. Malito then filled a bag with currency and gave it to defendant. As defendant began to leave the store, he stopped and asked if that was all the money there was. While this occurred Markiewcz continued to look at defendant, who was still about six feet away. Malito then explained that she had just made a deposit and that she had given him all the money. During the incident, Markiewcz had an unobstructed view of defendant.

Later that evening Markiewcz went to the police station and assisted in completion of a composite sketch of the offender. She also looked at several books of photographs, but did not see defendant's picture contained therein. In mid-May 1984, the police showed her six

additional photographs and she selected defendant's picture. She immediately identified defendant from a subsequent lineup because "I was sure that that was the man." She also recognized his voice when he spoke during the lineup procedure.

There was police testimony that defendant had been identified as the robber of an ice-cream store located in the same Chicago Heights shopping plaza. An ice-cream store employee testified that about 8 p.m. on April 17, 1984, defendant, whom she described as fairly tall, entered the store while she was working alone. She gave him the cup of ice cream that he ordered, and as she was by the cash register, defendant produced a small silver gun and demanded that she put money in the bag where she had put the cup. During the time defendant was in the store he was only several feet away from her, and she looked directly at his face.

Defendant's father testified that his son was 6 feet 2 inches tall and weighed about 185 pounds. This description varied from that obtained from Malito and Markiewcz, who placed the assailant at about 5 feet 9 inches in height and 180 pounds. However, the grocery store office area where that armed robbery occurred was elevated about 10 inches above the general floor level where the gunman stood.

Defendant testified on his own behalf, denied committing either armed robbery and said that he could not recall where he was on either occasion. Defendant said that he was 6 feet 2 inches tall and weighed between 185 to 190 pounds. Defendant also claimed that he wore a slight beard and mustache until March 1984, although neither grocery store employee mentioned that the gunman had this facial hair.

I

■ Defendant contends that the testimony of the ice-cream store employee concerning that armed robbery was prejudicial and introduced only to improperly show his propensity to commit crimes. At the close of the trial, the court instructed the jury that evidence of this crime went "solely on the issue of defendant's identification and common scheme" and could be considered "only for the limited purpose for which it was received." (Illinois Pattern Jury Instructions, Criminal No. 3.14 (2d ed. 1981).) Defendant claims that there was nothing distinctive about either armed robbery, thus negating the State's position that the *modus operandi* of both crimes was comparable, and that it was improper to use the testimony of the ice-cream store employee to bolster the identification testimony of the grocery store employees. Defendant also asserts that the error of the other

crime evidence was exacerbated when the jury was not advised during the witness' testimony that evidence related to the ice-cream store armed robbery was to be used for a limited purpose.

In *People v. Bryan* (1987), 159 Ill. App. 3d 46, 511 N.E.2d 1289, this court had occasion to discuss the use of other crime evidence. There the court said:

> "Evidence of crimes other than the one for which defendant is being tried is generally not admissible because it tends to be unfairly prejudicial. [Citation.] Exceptions exist where the evidence of other crimes shows motive, intent, identity, preparation, common scheme or design, absence of mistake or *modus operandi*. [Citations.]
>
> It appears that in using the term 'common scheme or design' in the case at bar, the trial court in fact was referring to the *modus operandi* of the perpetrator. Although Illinois courts have tended to use the terms 'common scheme or design' and '*modus operandi*' interchangeably, they are not synonymous. [Citation.] *Modus operandi* refers to crimes that are so nearly identical in method that they are clearly the work of the accused. Common design, like *modus operandi*, may also be probative of the identity of the actor; however, common design refers to a larger criminal scheme of which the crime charged is only a portion. [Citation.] While common design is not at issue here, we believe that the *modus operandi* exception is applicable.
>
> Many courts have held that evidence of other crimes is admissible to show *modus operandi* only if the manner in which the crime has been perpetrated is so distinctive as to amount to a 'signature' [Citation]; Illinois courts have adopted less stringent requirements. Other crimes evidence has been found admissible where the other offense is substantially similar and has common features with the offense charged; the crimes need not be identical. [Citation.]
>
> \* \* \*
>
> Other crimes evidence is also admissible to show identity provided that the probative value of the evidence outweighs its prejudicial effect." 159 Ill. App. 3d at 51-52, 511 N.E.2d at 1292-93.

In the present case the armed robberies occurred in the same shopping plaza about the same time of evening and the assailant used a silver-colored gun. Given the circumstances we do not believe that error occurred in allowing the ice-cream store employee to testify.

Although the dissenting judge concludes that the robbery on April 17, 1984, was "independent, unconnected and disassociated" with the robbery of February 3, 1984, we disagree. (168 Ill. App. 3d at 823.) The robberies were committed about the same time, in the same shopping center. The assailant used a silver-colored gun in each robbery and a bag for the robbed money. In our judgment, there were sufficient similarities between the crimes as to permit the introduction with the appropriate cautioning instructions. In addition we note that the trial court's instruction to the jury properly limited the extent to which the other crime evidence was to be considered. See *People v. Shum* (1987), 117 Ill. 2d 317, 512 N.E.2d 1183.

## II

Defendant next contends that it was error to allow the grocery store employees to testify that they had looked through many police photograph books without identifying anyone. Defendant characterizes this evidence as an improper attempt to bolster their identifications through the use of prior inadmissible consistent statements. In *People v. Trass* (1985), 136 Ill. App. 3d 455, 483 N.E.2d 567, a police officer testified to one of the victim's prior nonidentification of two suspects from a lineup that did not include defendant. The victim identified defendant from a subsequent lineup. The court concluded that such testimony was irrelevant and inadmissible. However, the court also concluded that the nonidentification testimony was not prejudicial to defendant.

Here, too, we do not believe that such nonidentification testimony was prejudicial. Each grocery store employee viewed defendant from a short distance for a sufficient length of time. Each positively selected defendant's photograph when shown by police. Each then picked defendant from a lineup, and a voice identification was also made. The grocery store employees' identifications were positive and overwhelmingly established defendant's guilt.

The dissenting judge's suggestion that there is a trend by some prosecutors approved by some trial courts to put into evidence a defendant's commission of unrelated crime under the guise of *modus operandi* has not been observed by the majority. The majority does agree that appellate courts have at times been inconsistent on this and other evidentiary subjects.

Accordingly, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

SULLIVAN, J., concurs.

JUSTICE PINCHAM, dissenting:

I dissent. The defendant has at all times insisted that he has been mistakenly identified as the robbery offender. The jury's guilty verdict that he was the robbery offender was not fairly or properly determined.

The defendant, Albert M. Hayes, was a 19-year-old black male. He was 6 feet 2 inches tall, weighed 180 pounds, was slender in build and he had a thin face. He did not fit the description of full, round face, stocky and chunky in build, 5 feet 9 inches tall, 180 to 185 pounds, 24 to 25 years old, with sparse hair and a receding hairline, which was given to the police by the February 3, 1984, robbery victim, Linda J. Malito, and witness, Cheryl Pitrowski. The defendant for nine years had grown up and lived at 289 Lynn Lane, Chicago Heights, Illinois. His home was in the immediate vicinity of Garofalo's Food Store at 177 West Joe Orr Road, Chicago Heights, where the Malito robbery occurred. The defendant had been a customer in Garofalo's over a hundred times throughout the nine years he had lived on Lynn Lane. Both the robbery victim, Linda Malito, an eight-year manager-clerk at Garofalo's, and the robbery witness, Cheryl Pitrowski, an 11-year cashier at Garofalo's, testified that they had never previously seen the person who robbed them. The defendant was belatedly, and for the first time, identified as the robber by Pitrowski and Malito over three months after the robbery. Not one bit of corroborating evidence—fingerprints, gun, loot, clothing, confession, admission, etc.—was presented of the defendant's commission of the February 3, 1984, Malito-Garofalo's robbery. The defendant was a 1983 Homewood-Flossmoor High School graduate and had attended Prairie State College and Southern Illinois University for almost a year. He adamantly and persistently denied committing the robbery. The trial court prohibited the defendant's attorney from even mentioning to the jury during his opening statement that the defendant had never been previously arrested. Yet, the trial court conversely allowed the prosecutor to present to the jury extensive prejudicial, inadmissible evidence of the defendant's commission of an unrelated April 17, 1984, armed robbery of Mary Malvestuto at a Baskin-Robbins ice-cream store. The defendant also denied committing this robbery. The trial court erred and, further, improperly relied on erroneous legal principles in admitting this extraneous evidence. The integrity of the fact-finding process was flagrantly violated and the veracity of the jury's guilty verdict was poignantly contaminated. Reversal of the defendant's

conviction is demanded.

The defendant was on trial for an alleged armed robbery of Linda Malito at Garofalo's Food Store on February 3, 1984. During this trial, the prosecutor presented voluminous evidence of the defendant's commission of another, unconnected armed robbery of Mary Malvestuto at a Baskin-Robbins ice-cream store on April 17, 1984. In effect, the prosecutor thereby simultaneously put the defendant on a single trial for two separate, unconnected armed robbery offenses.

Section 111—4 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 111—4(a)) provides that two offenses may be charged in the same indictment or information only if the alleged offenses are based on the same act, or on two or more acts which are part of the same comprehensive transaction. It is patently obvious that the February 3, 1984, Malito-Garofalo's robbery and the April 17, 1984, Mary Malvestuto, Baskin-Robbins robbery were not based on the same act or on two or more acts which were part of the same comprehensive transaction.

The defendant was convicted of the murder of his wife in *People v. Lindgren* (1980), 79 Ill. 2d 129. During his murder trial the prosecutor contended and presented evidence of the defendant's commission of an arson shortly after the murder to establish the defendant's consciousness of guilt and his concealment and presence at the murder scene. In reversing, the supreme court cautioned and commanded:

> "The erroneous admission of evidence of other crimes carries a high risk of prejudice and ordinarily calls for reversal.
>
> $* \quad * \quad *$
>
> There is also the matter of the integrity of the system. A litigant's right to a trial by an unbiased jury is violated where the jury in fact based its decision on extraneous matters. This is a substantial right normally afforded to guilty and innocent defendants alike. Collateral-crimes evidence is likely to violate this right. Therefore, we hold that the defendant deserves a new trial with a jury unbiased with evidence of the arson."
> *Lindgren*, 79 Ill. 2d at 140, 143.

In *People v. Bricker* (1974), 23 Ill. App. 3d 394, 396-97, 319 N.E.2d 255, the defendant was tried on a two-count indictment which charged the defendant with the commission of an armed robbery of a gasoline service station at 12:30 a.m. on July 14, 1972, and with the commission of a second armed robbery of a hotel desk clerk a few hours later and a short distance from the gasoline service station. The jury found the defendant guilty of the service station robbery and acquitted him of the hotel robbery. This court reversed and held:

"It is axiomatic that a defendant may not be placed on trial, over his timely objection, on an indictment charging separate offenses when it appears these offenses are not part of one and the same transaction, but are 'separate and distinct both in law and in fact. [Citations.] A defendant cannot be forced to trial on disassociated felonies.' [Citation.]

[T]here is nothing in the record to establish that there was a concerted plan of action or scheme on the part of the defendant that would link the two armed robberies. They are separate and independent felonious acts. Under the cited authority, the State should have tried defendant in separate proceedings for each offense." 23 Ill. App. 3d at 396-97.

There is nothing in the record in the case at bar to establish that there was a concerted plan of action or scheme on the part of the defendant that would link the February 3 Malito-Garofalo's robbery to the April 17 Malvestuto–Baskin-Robbins robbery. The two robberies were separate, independent, unconnected and disassociated felonious acts. The State should have tried defendant in separate trials for each offense.

This court pointed out in *People v. Tate* (1982), 106 Ill. App. 3d 774, 776-77, 436 N.E.2d 272, that when a defendant is placed on trial simultaneously for separate, unrelated offenses "there is danger that the jury may consider the evidence of the defendant's commission of one of the offenses as showing a propensity to have committed other offenses."

The State's evidence of the defendant's commission of the February 3 Malito-Garofalo's robbery was not overwhelmingly persuasive. The witnesses' description of the robber did not match the defendant's description. There was no corroborating evidence. The defendant was belatedly identified by the witnesses as the robber. The witnesses' identification of the defendant was under rather unusual circumstances. The defendant denied commission of the robbery. The prosecutor's effort to buttress evidence of the defendant's commission of the February 3 Malito-Garofalo's robbery by the admission of evidence of the defendant's commission of another unrelated robbery is quite understandable. Nevertheless, such prosecutorial effort is unacceptable and is legally impermissible.

The Malito-Garofalo's Food Store robbery occurred in Chicago Heights on February 3, 1984. Malito and the witness, Cheryl M. Pitrowski, described the robber to the police as stocky and chunky in build, with a full, round face, 5 feet 9 inches tall, 180 to 185 pounds, 24 to 25 years old, black, male, with a receding hairline and wearing a

green, baggy, loose-fitting army jacket.

Linda Malito testified that she was 5 feet 5 inches tall. Cheryl Pitrowski testified that her height was "five eleven and a half, flat foot." Pitrowski's height is unusually tall for a woman. The evidence that the defendant was 6 feet 2 inches tall, 2½ inches taller than Cheryl Pitrowski, is uncontradicted. Yet, both Pitrowski and Malito described the robber as shorter than Pitrowski. Their suggested explanation for this contradiction, that Pitrowski and Malito were standing on a 10-inch platform when they were robbed, is ludicrous.

Two and a half months after the Malito-Garofalo's robbery, on April 17, 1984, Mary Malvestuto was robbed at the Baskin-Robbins store in Chicago Heights. She described the robber to the police as a black male, in his early 20's, medium complexion, brown eyes, short cropped black hair, clean-shaven and fairly tall. Malvestuto stated that she was 5 feet 5 inches tall and she told the officers that the robber was about five or six inches taller than her.

The subsequent events and the circumstances surrounding the identification of the defendant on May 14, 1984, as the February 3 Malito-Garofalo's robber and as the April 17 Malvestuto–Baskin-Robbins robber are peerless. On the pretrial hearing of the defendant's motion to quash his arrest and to suppress evidence, it was established that Chicago Heights police officer Paul Palcek called the defendant's home on May 14, 1984, and asked the defendant's father, who was a marketing analyst for Allstate Insurance Company, to bring the defendant into the Chicago Heights police station, ostensibly to clear up Palcek's report of a purported trespass by the defendant on February 21, 1984, three months earlier.

On February 21, 1984, the defendant and two companions walked behind 525 Hamilton Woods in Chicago Heights, along a creek, going fishing. This Hamilton Woods area was also behind the defendant's home at 289 Lynn Lane in Chicago Heights. The defendant and his companions were inadvertently on the property of Mrs. Ellie Lipe. Mrs. Lipe's daughter, who was a high school classmate of the defendant's and knew the defendant by his name, and Mrs. Lipe saw the defendant and his companions on the Lipe property and asked them to get off the Lipe property. The defendant was unaware that he was on private property and he got off and left the Lipe property when Mrs. Lipe told them to do so. Mrs. Lipe never made a complaint against the defendant. It is further noteworthy that Officer Palcek's May 14 telephone request to the defendant's father to bring the defendant into the police station was three months after the defendant's so-called trespass on the Lipe property, but the call was less

than a month after the April 17 Malvestuto–Baskin-Robbins robbery.

Officer Palcek told the defendant's father that he wanted to talk to his son. The defendant's father asked Palcek what it was about. Palcek told him that it was a matter of his son's trespassing across a lady's yard in Hamilton Woods, which was the area behind the defendant's house, and Palcek "just wanted to talk to him and get some information."

In compliance with Officer Palcek's May 14 telephone request, at two o'clock that afternoon the defendant's father took the defendant to the Chicago Heights police station. Palcek took the defendant into an office and asked him a few questions about the Lipe property incident, during which time Palcek had the defendant's father wait outside in the lobby. The defendant answered Palcek's questions. As the defendant was leaving, Palcek told the defendant "he wanted to take a picture just for references, to put it on file to say that he did do the report *** and he wanted the defendant's picture to close out his file." The defendant had never been arrested before and neither the Chicago Heights police department nor any other police department had the defendant's picture. Palcek took a Polaroid picture of the defendant. The defendant and his father left the police station.

From these and the hereafter-mentioned subsequent events, the defendant vehemently argued that Officer Palcek's purported Lipe property trespass interrogation-investigation was a ruse, a subterfuge, a pretext, a spurious ploy by Palcek to obtain the defendant's picture. Palcek testified that he "intended to take the defendant's picture to Mrs. Lipe's daughter, who is the one who stated she knew Mr. Hayes *** [and that] Albert Hayes was one of the persons that was trespassing on the land. She went to school with him." Palcek further testified:

"Q. So you were going to show that photograph for identification purposes to Mrs. Lipe's daughter?

A. Yes. If we felt that the circumstances warranted it, you know."

But obviously the circumstances wouldn't warrant Palcek showing Mrs. Lipe's daughter the defendant's picture. Palcek knew that Mrs. Lipe's daughter was the defendant's schoolmate and that she had known and identified the defendant by his name. Moreover, according to Palcek, a rare occurrence intervened which caused Palcek not to show the defendant's picture to Mrs. Lipe's daughter.

A composite drawing of the February 3 Malito-Garofalo's Food Store robber was made from descriptions given by the robbery victims. According to Palcek this composite drawing of the robber was

posted on the police station bulletin board. Palcek testified that after he took the defendant's Polaroid picture on May 14 and after the defendant had left the police station, Palcek fortuitously looked at the police station bulletin board's composite drawing of the Malito-Garofalo's robber and noticed that it matched the defendant's Polaroid picture that Palcek had just taken. Palcek testified on direct examination:

"Q. After you saw Albert Hayes in the police station on the 14th of May and after he left the station, did you notice anything?

A. Yes, I did.

Q. What did you notice?

A. Mr. Hayes appeared very—looked like a composite drawing we had of a suspect in another crime.

Q. And this composite drawing, where was that located?

A. It was hanging on the bulletin board right in our office.

Q. Was it hanging on the bulletin board among other things that are also hanging on the bulletin board?

A. Yes.

Q. Pictures of other suspects?

A. Yes. Any current suspects or are looking to—

Q. And what did you notice regarding this composite that you had and Mr. Albert Hayes?

A. Mr. Albert Hayes looked very close to the composite drawing we had, his features and the description after seeing him was very close.

Q. And what's the connection between the composite and the defendant?

A. After I looked at it and thought about it I felt that he resembled the composite."

Palcek never recorded in any police reports this extremely pertinent and highly relevant observation and conclusion of the similarity and resemblance of the composite drawing of the wanted robber and the defendant's picture. Palcek testified on cross-examination:

"Q. Now, you made out a number of police reports, isn't that right?

A. Relating to what?

Q. This case, these cases.

A. There were police reports made but, yes, by myself.

Q. And in none of these police reports do you mention a composite?

A. I did not issue the composite.

Q. You're the one that saw it on the police wall?

A. That's correct.

Q. You did not put that in your report?

A. I didn't see the necessity of it.

Q. And the fact that you took Albert Hayes' picture on the 14th of May, you did not put that in your report, either, did you?

A. No, I didn't put that I took his picture, no, ***.

Q. Well, you did not put it in your report.

\* \* \*

Now, I show you what has been marked as Petitioner's Exhibit No. 2 for identification purposes and ask you to look at it. Have you looked at it?

A. Yes.

Q. Do you know what that is purported to be?

A. Yes. That is my supplement to my interview with Mr. Hayes on the 14th of May.

\* \* \*

Q. Well, after you saw the composite, did you make another report?

A. No.

Q. And you did not put in anything about this composite in any other report, is that right?

A. That's correct.

Q. When did you first tell the State's Attorney about this composite?

[Assistant State's Attorney]: Judge, objection.

THE COURT: Sustained.

[Defense Attorney]: Well, Judge, I think its rather important because I have had this case pending for eighteen months and this is the first day that I learned of a composite *** and there is nothing about this composite in any report."

The assistant State's Attorney objected when the defense attorney asked Officer Palcek who was present when the composite was drawn. The defense attorney significantly responded to the objection as follows:

"Well, it seems to me that we have a right to know who was—the people who gave the information to the officer saying that this is the person or a composite of the person that committed the incident.

It would be in the police reports here if he had done it, I'm sure. *** This is the same composite that he says that he

looked at after he got the picture and started him on this whole investigation. It seems to me we should know if this composite was made by one of the victims, two of these victims or three of these victims.

I really don't understand why it's not in any of these police reports. It seems to me like it's a substantial part of the case and we have no report about it at all."

Officer Palcek stated that he believed that the composite was on the police station bulletin board from February until May 14. He admitted that none of the police reports "indicated anything about a composite." Palcek further admitted:

Q. Now, you did not put in your police report at anytime after that, that after you saw the composite, you then suspected Albert Hayes, is that right?

A. That's correct.

Q. In fact, if someone would read over the police reports you have written on this case, they would never know this composite had anything to do with this arrest, isn't that right?

A. Quite possibly."

Officer Palcek testified that on May 14, within two hours after he chanced to notice the similarity between the composite drawing of the February 3 Malito-Garofalo's robber and the defendant's Polaroid picture that he had just taken, he showed the defendant's Polaroid picture, along with several pictures of other black males, to the robbery victims. These pictures and the composite drawing are not a part of the record on appeal.

Palcek stated that a robbery victim picked out the defendant's picture as the person who had robbed her. Palcek further related:

"Q. And prior to the 16th of May, 1984, did you have an occasion to show his [defendant's] photograph to anyone else?

A. Yes.

Q. And how many other people did you show it to?

A. I believe there were four people altogether, that is all the pictures.

\* \* \*

Q. And during these showings did anybody identify anybody?

A. All the victims identified Mr. Hayes.

Q. And what type of victim were these additional people?

A. Armed robbery victims.

Q. And they identified Mr. Hayes as what?

A. The offender in the armed robberies."

On May 16 Palcek arrested the defendant in front of the defendant's home and thereafter placed the defendant in lineups. Linda Malito and Cheryl Pitrowski identified him as the person who robbed them on February 3, 1984, and Mary Malvestuto identified the defendant as the person who robbed her on April 17, 1984. The defendant was also identified by even another victim of a robbery which occurred at Friar's Fish Store on March 24, 1984. Thus, within a few hours after Palcek took the defendant's picture, under circumstances which the defendant characterizes as pretextual and spurious, the three armed robberies of February 3, March 24 and April 17, which spanned and went unsolved over 2½ months, were suddenly cleared up. The defendant was charged in three separate informations with the commission of these three robberies.

The prosecution made a pretrial *in limine* motion to prohibit the defendant's attorney from stating to the jury in his opening statement, at the defendant's trial on the Malito-Garofalo's February 3 robbery, that the defendant had never been arrested before his arrest in that case. The prosecutor stated:

> "Judge, we would make a motion *in limine* of counsel, in his opening statement, to prevent him from making any mention of the fact that this is the defendant's first adult arrest. I can't believe it's a proper matter to be brought out in front of the trier of fact."

The trial court sustained the prosecutor's *in limine* motion.

At another pretrial proceeding the prosecutor advised the defendant's attorney and the trial court, however, that, conversely, he intended to present collateral evidence of the defendant's commission of the March 24 Friar's Fish Store robbery and the April 17 Malvestuto--Baskin-Robbins robbery at the defendant's trial for the February 3 Malito-Garofalo's robbery. The prosecutor argued that the robberies were "all within 6 months of one another. *** The people identify the same person, all occur similarly with the same type of weapon. They all occur within a half block of one another *** about the same time of the night." The prosecutor further erroneously argued to the trial court, "[I]t's very clear from the cases I will tender actually the general rule is to allow evidence of other crimes." The prosecutor reneged on his promise. He tendered no such case. There is no such case. In *People v. Barbour* (1982), 106 Ill. App. 3d 993, 999, 436 N.E.2d 667, the court pointed out, "The State acknowledges the general rule that evidence of crimes not charged in the indictment is inadmissible."

The prosecutor additionally urged to the trial court in the case at

bar, "This offense was committed at Garofalo's at 179 West Joe Orr Road. *** Another one of the offenses was committed at Friar's Fish Store, 179½ West Joe Orr Road; another one of the offenses was committed at Baskin-Robbins at 205 West Joe Orr Road. *** The three stores are located within less than a block of each other *** in a small shopping plaza called the Olympia Shopping Plaza. When did the crimes occur? Garofalo's, February 3rd; Friar's, March 24th, Baskin-Robbins, April 17th. *** [T]hese three armed robberies were committed within one block of each other within ten weeks of one another. The time, the specific time of day when they occurred: Garofalo's, 8:10 p.m.; Friar's, 8:03 p.m.; Baskin-Robbins, 7:50 p.m. *** all within 20 minutes of each other." The prosecutor further erroneously contended for admission of evidence of the defendant's commission of the other robberies, that during the robberies "a bag was used by the defendant to put the money in. He [the defendant] said, 'Here is a bag. Put the money in the bag.' " The prosecutor further mistakenly urged that the different robbery victims "described the defendant as wearing a green Army fatigue-type jacket." The prosecutor inaccurately concluded from his foregoing contentions that evidence of the defendant's commission of the March 24 Friar's Fish Store robbery and the April 17 Baskin-Robbins robbery was admissible at the defendant's trial for the February 3 Malito-Garofalo's robbery, as evidence of the defendant's common scheme or *modus operandi*. Evidence of the defendant's commission of the two unrelated robberies was not admissible under either theory. The *modus operandi*, the "method of working," the "pattern of the offenders' criminal behavior" in the commission of the three robberies were not so distinctive or unique that they were recognizable as the handiwork of the same wrongdoer.

In reversing the conviction in *People v. Barbour* (1982), 106 Ill. App. 3d 993, 436 N.E.2d 667, this court emphatically disapproved the admission of evidence of the defendant's commission of other crimes, under the guise of *modus operandi* or common scheme in the following language:

> "The State (and, indeed, some of the authorities) have used 'common design' and *'modus operandi'* interchangeably but the concepts are quite distinguishable. A common design refers to a larger criminal scheme of which the crime charged is only a portion. *Modus operandi* means, literally, 'method of working,' and refers to a pattern of criminal behavior so distinctive that separate crimes are recognizable as the handiwork of the same wrongdoer. (See generally McCormick, Evidence §190, at 448-

49 (2d ed. 1972).) A common design is frequently relevant to show the motive for the crime charged. *Modus operandi* is most useful in showing that the accused is the perpetrator of the crime charged.

There is no reason to believe that the alleged rapes are part of a common scheme. In arguing that the rapes share a *modus operandi*, the State lists approximately 19 similarities among the crimes. Some of the purported similarities are irrelevant coincidences (*e.g.,* none of the women drank heavily) and others are merely descriptive of the crime of rape (*e.g.,* force was used in all three attacks). While a showing of *modus operandi* does not require that the similarities be unique to the offenses being compared, there must be 'some distinctive features that are not common to most offenses of that type.' (*People v. Tate* (1981), 87 Ill. 2d 134, 142-43, 429 N.E.2d 470.) In the case at bar, the State has simply failed to make the 'strong and persuasive showing of similarity' required to demonstrate *modus operandi.* (*People v. Tate* (1981), 87 Ill. 2d 134, 141.) The State's lengthy list of purported similarities does not establish that the three alleged rapes were 'so nearly identical in method as to earmark them as the handiwork of the accused.' McCormick, Evidence §190, at 449 (2d ed. 1972).

Even if the State had shown a distinctive pattern of criminal behavior, the evidence would still be inadmissible. The State appears to assume that when a clear *modus operandi* has been shown, evidence of other crimes employing the same *modus* is automatically admissible. This assumption is incorrect and ignores a fundamental rule of evidence: 'Whatever is *relevant* is admissible.' (Emphasis added.) (*People v. Gray* (1911), 251 Ill. 431, 439, 96 N.E. 268.) To be relevant, a given fact must tend to make a proposition at issue either more or less probable. (See *People v. Gray* (1911), 251 Ill. 431, 439.) Relevance is the touchstone of admissibility and *defendant's other crimes, even those sharing a common modus operandi, are inadmissible unless the State shows that the evidence is probative of a proposition at issue.*

\*\*\*

\*\*\* 'The law distrusts the inference that because a man has committed other crimes he is more likely to have committed the current crime.' (*People v. Lehman* (1955), 5 Ill. 2d 337, 342, 125 N.E.2d 506.) Where testimony has no value beyond the inferences that the defendant has a propensity for the crime

charged, the testimony is excluded." (Emphasis added.) 106 Ill. App. 3d at 999-1001.

The defense attorney objected to the admission of evidence of the March 24 Friar's robbery and the April 17 Baskin-Robbins robbery at the defendant's trial on the February Malito-Garofalo's robbery. He urged that the robberies were distinctively dissimilar, that there was no relationship between the three robberies, that the robbery victims' descriptions of their robber were appreciably different, that the three robberies occurred over an extended period of over 2½ months and that the methods by which the three robberies were committed were different and were not so unique or distinct to establish that all three robberies were the handiwork of the same person.

The trial court did not conclude, and on the facts presented to it the trial court could not possibly have legitimately concluded, that the *modus operandi*, the "method of working" or the "pattern" of the commission of the three robberies were so distinctive that they could be recognized as the unique craft of the same offender. The trial court did not rely on any uniqueness or distinctiveness of the three robberies. Instead, the trial court simply relied on the similarities of the three robberies in mistakenly ruling that evidence of the commission of the three robberies was admissible at the trial for the commission of only one of them. Clearly, this was error.

The following trial colloquy occurred:

"[Defense Attorney]: First of all, I don't know why the State has to elect if they are going to try them all at the same time anyway. The law, the Statute gives them the right to elect on the case that they are going to try. And then they come back and tell you that 'We're going to try all three of them.' Secondly, the general rule has not changed, and that is that a person has a right to be tried separately. All these offenses he has a right to be tried separately.

\* \* \*

There are certain things that are similar here, but that is true to all armed robberies. You have to have certain elements. If you don't have certain elements, it is not even an armed robbery. So that is not really unusual.

[T]hese descriptions are not the same. One person said a person is 5'6", medium height; right-handed. The other person said he is 6'. \*\*\* the reports are not similar \*\*\* three people pick out one man, that is not something that should be very persuasive to a judge. \*\*\*

THE COURT: Well, Counsel, what is your response to the

representations of the State with respect to 6 or 7 items of similarities that they pointed to? *** They all occurred within one block in the same Olympia Shopping Center?

[Defense Attorney]: Yes. Not in one block, really it is two blocks. *** But they did not tell you anything about the time factor in relationship to one happened in February and the other one happened in April.

THE COURT: Yes, they admit approximately ten weeks difference, but they claim the time—each time was between 7:50 and 8:10 p.m. Another element they cited was there were no customers present. Another element is the same gun, shiny gun allegedly was used in each.

[Defense Attorney]: That is not true. One of them, Judge, no weapon, they did not see a weapon.

[Assistant State's Attorney]: That is not true, Counsel has stated a couple things that just—

[Defense Attorney]: That is what my report says.

THE COURT: And the description of the Defendant in terms of brown eyes, short hair, approximately the same age by each of the victims' estimates, clean shaven, wearing a green Army fatigue jacket. Each of the victims identified the Defendant. These are all elements that the State is relying on to show similarities.

[Defense Attorney]: One of them, they said a person that was dark skinned. One said medium. The other one said brown. One said he is 20 to 23 *** 20 to 25 *** 20's Weight: medium, one said 180, one said 160. But how do you get around one person saying 5'6", another saying 5'10" and then 5'9"? ***

THE COURT: *** *So in light of the similarities that I have already enumerated *** I am going to deny the defense motion in limine [to exclude the evidence of the Friar's March 24 and the Malvastuto–Baskin-Robbins robbery April 17 robberies].* (Emphasis added.)

First, mere ordinary similarities in the commission of armed robberies do not establish *modus operandi*. (*People v. Barbour* (1982), 106 Ill. App. 3d 993, 999-1000.) Second, mere ordinary similar descriptions of an offender do not establish *modus operandi*. The conduct and descriptions of the offender of the multiple offenses must be so unique and distinctive that they establish that the multiple offenses were the handiwork of the same offender. Third, the evidence of the purported similarities of the offenses in the case at bar plainly improperly established the defendant's propensities for committing

crimes. Fourth, as previously pointed out, there were no similarities in the robbery victims' descriptions of the robber, which descriptions, also as previously pointed out, did not match the description of the defendant. Fifth, contrary to the prosecutor's contention, there were no similarities in the commission of the armed robberies and the majority erroneously concludes that because "the robberies were committed about the same time, in the same shopping center[,] [T]he assailant used a silver-colored gun in each robbery and a bag for the robbed money *** there were *sufficient similarities* between the crimes as to permit the introduction" of evidence of the April 17 robbery (168 Ill. App. 3d 820).

Linda Malito and Cheryl Pitrowski testified that immediately upon the robber's entry into Garofalo's Food Store, the robber pulled a gun when Malito asked the robber if she could help him. The robber produced a paper bag and ordered Malito to put the money in the bag and the robber promptly left the store. The robber did not make a purchase. The robbery of Mary Malvestuto at the Baskin-Robbins store was appreciably different. Malvestuto testified that when the robber entered the store, he started looking at the ice cream. When Malvestuto asked the robber if she could help him, unlike in Garofalo's the robber placed an order. He responded "yes" and ordered a scoop of butter-pecan ice cream. Malvestuto asked him if he wanted a cup or a cone, and the robber told her that he wanted a cup. Malvestuto got the ice cream out of the case and asked the robber if he wanted a lid on the cup and the robber said "Yes." Malvestuto turned around and got a lid from the counter and put it on the cup. She walked over to the register and asked the robber if there was anything else. He responded "No." Malvestuto rang up the sale on the register, bent over and got a bag from underneath the counter, unlike in the Garofalo's robbery, where the robber produced the bag. Moreover, Malvestuto's testimony is not convincingly clear that the robber directed her to put the money in the bag. She testified on direct examination:

"Q. And after you got the bag, what happened?

A. I looked up, and he told me—I saw the gun out, and he told me to put the money in the bag.

Q. Put the money where?

A. He said hand over the money.

* * *

Q. I'm sorry, what did he say?

A. He said, 'Hand over the money.'

* * *

Q. When he told you hand over the money with the gun pointed at your stomach, what did you do?

A. I took the money out of the register and put it in the bag.

Q. What bag did you put the money into?

A. The bag that the ice cream was in."

On cross-examination, Malvestuto testified:

"Q. You put the money in the bag?

A. Yes, I did.

Q. And gave the bag to him?

A. I set it down."

Again, unlike in the Malito-Garofalo's robbery, the robber ordered Malvestuto to go into the bathroom and flush the toilet. She did so. When she returned the robber was gone.

The prosecution's representation that the guns in the three robberies were similar (and therefore evidence of the commission of the three robberies was admissible on the trial of the first robbery) was factually inaccurate, logically unsound and legally fallacious. During his opening statement to the jury, the prosecutor described the guns used in the three robberies as "the same-similar type gun, automatic, chrome-type gun." However, Linda Malito testified on cross-examination:

"Q. And this weapon that you say you saw, you said it was a semi-automatic?

A. I didn't say it was a semi-automatic. I said it was about six inches, chrome; flat on both sides. I'm not real sure what the difference between a semi-automatic or automatic or anything else, as far as guns.

Q. So you never told the police that it was a semi-automatic?

A. I don't believe I did. Not that I remember.

Q. You don't know the difference between a semi-automatic and revolver, is that right?

A. No, sir, I don't."

Cheryl Pitrowski also testified that she did not tell the police that the robber displayed a semi-automatic and that she did not know what a semi-automatic was. She described the gun as small, chrome and very shiny and flat. Mary Malvestuto described the gun the robber pointed at her on April 17 at the Baskin-Robbins store as "small, about four inches long and silver."

First, no witnesses gave any unique, characteristic description of the weapon used in the robberies that would establish that the gun

used in the robberies was the same gun. Second, the victims' testimony of the description of the guns used in the different robberies does not establish the identity of the robber or that it was the defendant who used the gun in the robberies—that the defendant was the robber. Third, the defendant was not arrested with a gun, large or small, short or long, silver or bluesteel, in his possession and no gun was taken from him. Thus, the robbery victims' testimony of any similarities in the guns used by their robbery offender did not establish and was irrelevant to establish that it was the defendant who used the guns in the commission of the robberies and was not evidence that the defendant was the robber.

The same fallacy permeates and demolishes the prosecutor's contention that the robbery victims' descriptions of the robber's clothing were admissible as *modus operandi* evidence and identified the defendant as the robber. The robber's wearing apparel was not rare or unique. The prosecutor urged for admission of this evidence that "the description of clothing given by the victims in two of the three [robberies], Garofalo's and Friar's, described the defendant as wearing a green Army fatigue jacket." The prosecutor, however, did not call any witness from the March 24 Friar's robbery, and the robbery victims that the prosecutor did call did not similarly describe the robber's clothing. Linda Malito testified on direct examination:

"Q. And his clothes, were they dirty, slouchy?

A. He looked—no. He looked clean. It's like that was the style to wear. Everybody was wearing Army jackets. But it didn't seem roughed—like it was crushed up or anything like that. It seemed pretty clean."

Cheryl Pitrowski described the robber's coat as a green, baggy, loose-fitting Army jacket. Mary Malvestuto testified, however, that she did not remember if she told the police that the person who robbed her on April 17 had on a blue jacket. She stated that she only remembered that the robber's jacket was bulky and dark in color.

There was no evidence that a green, baggy, loose-fitting Army fatigue jacket or that a bulky, dark-colored jacket was seized from or was in the defendant's possession when he was arrested. Nor is there anything so unusual about the robber's clothing as described by the different robbery victims that would establish or even indicate that the person who robbed the different victims was the same person. For that matter, Linda Malito testified, "[It] was the style to wear. Everybody was wearing Army jackets." But more importantly, the various descriptions of the robber's clothing by the different robbery victims did not establish, were irrelevant to establish, and were not evidence

that the defendant was the robber. Where independent, reliable testimony that a defendant at some time, other than during the commission of the multiple robberies, possessed a distinctive gun or clothing which matched the distinctive gun or clothing described by the robbery victims' testimony, then, perhaps, such testimony could be properly considered in determining whether the defendant was the robber. In the absence of such testimony or such distinctive description in the case at bar, the witness' description of the robber's wearing apparel and gun in the April 17 Malvestuto–Baskin-Robbins robbery had no probative value and was clearly inadmissible at the defendant's trial for the February 3 Malito-Garofalo's robbery. Likewise, Malvestuto's testimony that it was the defendant who robbed her on April 17 was of no probative value and it was also inadmissible at the defendant's trial.

Even if the testimony of the defendant's commission of the April 17 Malvestuto–Baskin-Robbins robbery had been admissible as evidence of the defendant's *modus operandi* or common scheme or design, which it was not, there is yet another persuasive reason why this unconnected robbery testimony should not have been admitted. Its highly prejudicial impact so far outweighed and imbalanced its probative value that it should have been excluded for that reason. Seemingly, the trial court was of the erroneous opinion that the State had the absolute right to present this evidence to the jury and that the trial court was powerless to weigh and evaluate the prejudicial impact against the probative value of the evidence and thereby determine whether this evidence should have been admitted or excluded.

In *People v. Triplett* (1981), 99 Ill. App. 3d 1077, 425 N.E.2d 1236, the jury found the defendant guilty of murder and armed robbery of a Clark gasoline station on September 18, 1978. The State introduced evidence that the defendant had committed another robbery of a different Clark gasoline station three months previously. This court reversed and pertinently stated as follows:

"The State argues that the evidence of the prior crime *** was so similar to the one for which the defendant was being tried that it was relevant to show common design and *modus operandi*.

Evidence of crimes other than the one for which the accused is being tried is not admissible to show the accused's propensity to commit a crime. [Citation.] However, such evidence is generally admissible if relevant for another purpose such as to show motive, intent, identity, absence of mistake or *modus operandi*. *** However, the courts are stricter in applying the standards

of relevancy when the purpose is to prove identity or the commission by the accused of the crime charged than when the evidence is offered to show knowledge, intent or other state of mind. McCormick, Evidence §190 (2d ed. 1972).

Further, the problem of determining the admissibility of other crimes is essentially one of balancing, rather than of merely pigeon-holing. [Citation.] Even where it has substantial relevance for a permitted purpose, evidence of another crime should not be admitted if its probative value is outweighed by its prejudicial effect. [Citations.] *** [T]he probative value of and need for the evidence of the prior crime on this issue was minimal, and we believe, outweighed by the prejudicial effect. We believe the effect here was to influence the jury against the defendant by making the jury aware that he had been guilty of criminal conduct. In such cases the danger is that the jury will conclude that the defendant is of bad character and therefore probably committed the crime charged. [Citations.] The prosecutor here in fact argued to the jury according to such logic.

Further, we conclude that regardless of whether the evidence of the prior crime could be 'pigeon-holed' into another category such as common design or *modus operandi*, it is inadmissible in the context of this case. A prior crime may be admitted under the theory of *modus operandi* where the crimes are 'so nearly identical in method as to earmark them as the handiwork of the accused.' [Citation.] *** The methods of committing the two crimes were dissimilar in that: the defendant first approached the manager of the first station on a pretext whereas during the second robbery the offender simply confronted the manager with a gun; *** and the two crimes were committed three months and several miles apart. Thus, the probative value of admitting evidence of the prior offense is lessened by the fact that the crimes were so dissimilar and because many of the similarities are common to robberies in general. Further we must strictly apply the standards of relevancy since the purported purpose of admitting the evidence is to prove that the defendant was the perpetrator of the crime charged. Given the dissimilarities between the prior offense and the charged offense and the purpose for which evidence of the prior offense was admitted, we conclude that the prior offense had too little if any probative value in showing common scheme or *modus operandi* to outweigh the prejudicial nature of the evidence sought to be admitted." *Triplett,* 99 Ill. App. 3d at 1082-84.

In the case at bar, as in *Triplett*, "the problem of determining the admissibility of the crime [was] essentially one of balancing, rather than mere pigeon-holing." In the case at bar, as in *Triplett*, "the effect was to influence the jury against the defendant by making the jury aware that he had been guilty of criminal conduct." In the case at bar, as in *Triplett*, "the danger [was] that the jury [would] conclude that the defendant [was] of bad character and therefore probably committed the crime charged." In the case at bar, as in *Triplett*, "the prosecutor *** in fact argued to the jury according to such logic." In the case at bar, as in *Triplett*, "regardless of whether evidence of the [other] crime could be 'pigeon-holed' into another category, such as common design or *modus operandi*, it [was] inadmissible in the context of this case." In the case at bar, as in *Triplett*, "the methods of committing the two crimes were dissimilar *** [and] the probative value of admitting evidence of the [other] offense [was] lessened by the fact that the crimes were so dissimilar and because many of the similarities are common to robberies in general." In the case at bar, as in *Triplett*, "we must strictly apply the standard of relevancy since the purported purpose of admitting the [Malvestuto–Baskin-Robbins robbery] evidence [was] to prove that the defendant was the perpetrator of the crime charged." In the case at bar, as in *Triplett*, "given the dissimilarities between the [other] offense and the charged offense and the purpose for which evidence the [other] was admitted, we [should] conclude that the [other] offense had too little, if any, probative value in showing common scheme or *modus operandi* to outweigh the prejudicial nature of the evidence sought to be admitted." (*Triplett*, 99 Ill. App. 3d at 1082-84.) The majority's conclusion that "there were sufficient similarities between the crimes as to permit the introduction" of evidence of the April 17 robbery (168 Ill. App. 3d at 820), cannot be reconciled with this court's holding in *Triplett*.

Linda Malito's and Cheryl Pitrowski's testimony of their robbery for which the defendant was on trial was extensive. It constitutes 144 pages of the trial transcript. The testimony of Chicago Heights police officer Thomas Somer and Mary Malvestuto of the defendant's commission of the unrelated April 17 robbery was far more extensive and constitutes 150 pages of the trial transcript. Malvestuto told the jury how the robber entered the ice-cream store, ordered ice cream and thereafter pointed a gun at her. She related how she put the money in the paper bag, in which she had placed the ice cream, that the robber ordered her to go into the washroom and flush the toilet and that she did so. She stated to the jury how she reported the robbery and the robber's description to the police. Officer Somer and Malvestuto re-

lated that she viewed books of pictures, looked at composite drawings, picked out the defendant's picture as her robber, attended a lineup and picked the defendant out of the lineup. Somer identified the defendant to the jury as the person whose picture Malvestuto identified as her robber. Somer also pointed out the defendant to the jury as the person whom Malvestuto selected from the lineup as the individual who had robbed her. Malvestuto also dramatically pointed out the defendant as her robber to the jury. Somer and Malvestuto further identified State's exhibits, the Polaroid picture, the composite drawing, the defendant's lineup pictures and numerous pictures of the Baskin-Robbins store. The jury heard more testimony of the defendant's commission of the April 17 Malvestuto–Baskin-Robbins robbery, for which the defendant was not on trial, than it did of the February 3 Malito-Garofalo's robbery, for which the defendant was on trial. Its prejudicial impact greatly outweighed and imbalanced its probative value and it should not have been admitted.

During closing arguments to the jury the prosecutors made only minimal effort to conceal or to even disguise their voluminous and prejudicial arguments to persuade the jury to conclude from the evidence of the defendant's commission of the unrelated April 17 Malvestuto–Baskin-Robbins robbery that the defendant was of bad character and therefore probably committed the crime charged. The prosecutors' inappropriate and improper arguments to the jury follow:

"Not only did we present all of the evidence I talked about before, but we presented something else. We presented another victim of a totally separate armed robbery committed by the defendant.

\* \* \*

[Two] armed robberies. One of Garofalo's, one at Baskin-Robbins. How far were the stores away from each other? About a block in the same shopping plaza. What time did they occur? They both occurred almost exactly at eight o'clock in the evening. What type of gun did he use? He used a small silver gun with no barrel, within ten weeks of one another. How did he get away with the money? He put it in a bag and went away. Most importantly, most importantly about the commonness between the two is that the victims in both armed robberies identified him as the man who stuck them up. Both of them. All three of them, actually.

\* \* \*

And Mary Malvestuto, you saw her demeanor up there. She had ample opportunity. Again this is not broad daylight but it

was at least well lit as this. You know Baskin-Robbins Stores, they are about as close as I am to you, and a gun was pointed at her stomach and she remembers. She is not lying. With her it was a month before, April 17th, it occurred. And she sees a photo less than a month before and it's him. *** And she also identified Albert Hayes on the photographic lineup. *** The first person she identified is Albert Hayes. Why? Because Albert Hayes is the person that stuck a gun in her belly and said, 'Give me the money.' And stayed there for a time and had her look and look and look. That's why Linda Malito did, that is why Cheryl Pitrowski did and that's why Mary Malvestuto did. *** [Three] positive identifications. Use your common sense, please.

\* \* \*

*** [I] ask you to do that back there. Respect Linda Malito's rights and Cheryl Pitrowski's rights and Mary Malvestuto's rights. They have a right not to have a gun stuck in their belly and to have money taken from them. When they want a job, they have a right not to be scared half to death by somebody coming and pointing a gun and demanding money from them. I ask you to consider their rights. ***

\* \* \*

*** [His] face indicates he probably did have a chunky-build when he stuck up that food store and the Baskin Robbins, but you will have the photographs and you judge for yourselves. *** He knows there is no gun. He knows what he did with the gun. He got rid of the gun. It's been a month after the last incident. ***

\* \* \*

Another instruction that I believe the Judge is going to instruct you on, the fact that evidence may be considered. The evidence may be considered by you for a limited purpose, and that is the evidence of the other crimes, the crimes in which this defendant committed in the same shopping center about the same period of time of the day about ten weeks later using the same circumstances. And you should consider that evidence, because here is another witness, another witness who you have to consider her motive. What motive does she have? She got up on that witness stand and stated on April 17th, this man came in, 'Put a gun in my stomach, talked to me for a few minutes, was ordering ice cream before he pulled the gun. I am looking at him talking to him like a customer, and all of a sud-

den I see the gun and I fill the bag that I was about to serve the ice cream in with money.' He is at the same shopping center, a close period of time. It goes to the fact his identity being the same person and common sense, and you should consider it \*\*\*. And you have to say that they are mistaken. You have to say that they don't know what they are talking about. They have to say when they got up on that witness stand and pointed the finger at the defendant, they are mistaken on April 17th, they were mistaken on February 3rd, and they were mistaken on May 16th when they picked this man out of a lineup. I submit to you that is beyond all reasonableness. They were clear. They were convincing. And I would ask you to find Mr. Hayes guilty of the crimes charged."

This argument was highly improper and denied the defendant a fair trial. Where testimony of other crimes to establish common scheme or *modus operandi* is properly admitted it is customary, appropriate and advisable for the trial court to advise and caution the jury immediately before and promptly after the witnesses' testimony that the testimony is offered for the sole and limited purpose to establish *modus operandi* or common scheme or identity and that such evidence is not to be considered as evidence of the defendant's commission of the crime that is charged. The jury was not so cautioned in the case at bar. Contrary to the majority's assertion, the jury was not properly and adequately instructed on the April 17th unrelated Malvestuto–Baskin-Robbins robbery evidence. The trial court simply instructed the jury:

"Evidence has been received that the defendant has been involved in an offense other than that charged in the information. This evidence has been received solely on the issue of the defendant's identification and common scheme. This evidence may be considered by you only for the limited purpose for which it was received."

Based on the testimony in the case at bar, this instruction was inapplicable, inadequate and erroneous.

The jury found the defendant guilty of the February 3 Malito-Garofalo's robbery and he was sentenced to six years' imprisonment on that offense. Thereupon, on the State's motion, the court set the March 24 Friar's Fish Store robbery and the April 17 Malvestuto--Baskin-Robbins robbery cases for trial with an April 16 trial date.

One of the protections of Federal and State constitutional rights of an accused to be informed of and tried on the nature and cause of the accusation that is charged in the indictment or information is to

enable the accused to plead an acquittal or conviction thereof as a bar to subsequent proceedings brought against the accused for offenses for which the accused has been previously tried. The defendant was put to the task of defending against the April 17 Malvestuto–Baskin-Robbins robbery while on trial for the February 3 Malito-Garofalo's robbery. The defendant was compelled to and he accepted that burden. He testified and denied committing the April 17 robbery as well as the February 3 robbery. He did not endeavor to embellish his denial with a fabricated alibi. He candidly admitted that he did not recall where he was when the offenses were committed. Although the defendant was put to the task and he did defend against this unrelated April 17 robbery, he nevertheless cannot plead his February 3 robbery conviction as a bar to a subsequent prosecution and trial for the April 17 robbery. Thus, the fundamental right and protection of the constitutional right to be informed of and tried on the nature and cause of the charged accusation has been circumvented. In the case at bar the essence of the defendant's State and Federal constitutional right against being twice placed in jeopardy has been likewise convoluted and defeated. Although the defendant was previously called upon at the February 3 Malito-Garofalo's trial to also defend against the April 17 Malvestuto–Baskin-Robbins robbery, he can still be tried on and again put to the task of defending against this April 17 robbery offense. The deplorable tactics employed in the trial court, and here affirmed, decimate constitutional protections and are totally out of sync with the spirit of fundamental fairness.

When the defendant was given the opportunity to speak before the trial court imposed sentence, the defendant responded:

> "I am really and truely innocent, but as God is my witness, I show no shame."

Because of the voluminous inadmissible evidence of the defendant's commission of the unconnected April 17 Malvestuto–Baskin-Robbins robbery, the prosecutor's capricious illegal argument to the jury on such evidence, the trial court's failure and indeed its inability to properly instruct the jury on this inadmissible evidence, it cannot be convincingly or with persuasive certainty urged that the jury's guilty finding is factually correct or legally infallible. One of the most serious flaws in our justice system is the possibility of the wrongful conviction of an innocent accused because of mistaken identity. That flaw should not be enhanced by the tactics to which the prosecutor resorted in the instant case.

There appears to be a trend by some prosecutors, and approved by some trial courts, to improperly present evidence of the defend-

ant's commission of other unrelated crimes, for which the defendant is not on trial, under the guise and pretext of common scheme or *modus operandi*. As I expressed in my dissent in *People v. Harris* (1986), 147 Ill. App. 3d 891, 498 N.E.2d 621, and *People v. Partin* (1987), 156 Ill. App. 3d 365, 509 N.E.2d 662, I again voice my vigorous disapproval of and opposition to this ploy. Courts of review have correctly thwarted this trend (*People v. Lindgren* (1980), 79 Ill. 2d 129, 402 N.E.2d 238; *People v. Tate* (1981), 87 Ill. 2d 134, 429 N.E.2d 470; *People v. Esterline* (1987), 159 Ill. App. 3d 164, 512 N.E.2d 358; *People v. Grabbe* (1986), 148 Ill. App. 3d 678, 499 N.E.2d 499; *People v. Davis* (1984), 130 Ill. App. 3d 41, 473 N.E.2d 387; *People v. White* (1984), 129 Ill. App. 3d 308, 472 N.E.2d 563; *People v. Barbour* (1982), 106 Ill. App. 3d 993, 436 N.E.2d 667; *People v. Triplett* (1981), 99 Ill. App. 3d 1077, 425 N.E.2d 1230; *People v. York* (1975), 29 Ill. App. 3d 113, 329 N.E.2d 845). Yet, courts of review have occasionally improperly failed to defeat such prosecutorial schemes. (*People v. Harris* (1986), 147 Ill. App. 3d 891, 498 N.E.2d 621; *People v. Partin* (1987), 156 Ill. App. 3d 365, 509 N.E.2d 662. See *United States v. Haygood* (1974), 502 F.2d 166, *cert. denied* (1975), 419 U.S. 1114, 42 L. Ed. 2d 812, 95 S. Ct. 791.) While I agree with the majority's conclusion "that appellate courts have at times been inconsistent on this *** subject," (168 Ill. App. 3d at 820), the majority's holding in the case at bar is in conflict and cannot be reconciled with *Lindgren, Bucker, Tate, Barbour,* and *Triplett,* herein previously relied on and discussed.

Whether the Chicago Heights, Illinois, police department is entitled to credit for clearing up and solving three robberies, whether the prosecutors are entitled to credit for a successful prosecution, whether the four robbery victims-witnesses justifiably feel that the offenses committed upon them have been properly avenged, or whether the true culprit is still at large and continues to wreak criminal havoc on the community, the fact is that the convicted defendant, who languishes in prison protesting his innocence, did not receive that fair, orderly and impartial trial in accordance with the law of the land to which he was entitled, whether guilty or innocent. (*People v. Galloway* (1956), 7 Ill. 2d 527, 536, 131 N.E.2d 474; *People v. Savage* (1967), 84 Ill. App. 2d 73, 228 N.E.2d 215.) The jury's guilty verdict in the case at bar was irreparably tarnished. The defendant is entitled to a new trial.