THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ASHTON R. BARBOUR, Defendant-Appellant.

First District (2nd Division) No. 81-1292

Opinion filed May 25, 1982.

994

DOWNING, J., concurring in part and dissenting in part.

Howard T. Savage and George C. Howard, both of Chicago (Howard O. Edmonds, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Casimir J. Bartnik, and Thomas A. Rieck, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE STAMOS delivered the opinion of the court:
Following a bench trial, defendant was convicted of rape and deviate sexual assault. Defendant was sentenced to seven years' imprisonment on the rape conviction; the trial court did not impose sentence on the deviate sexual assault conviction. Defendant appeals.

Defendant is an attorney and was employed, at the time of the incident in question, as an assistant public defender in Cook County. The

complainant is a 23-year-old speech therapist. The parties met when defendant introduced himself to the complainant on a downtown Chicago street. A few phone calls followed and the complainant agreed to a dinner date with defendant.

On the evening of July 13, 1980, defendant picked up the complainant at her home on the south side of Chicago and the pair drove to a restaurant in Evanston. The complainant had one drink with dinner; defendant had three drinks. After dinner, they drove to a lagoon on the campus of Northwestern University. On the way to the campus, defendant stopped at a liquor store and bought a bottle of wine. The complainant testified that she suggested that defendant not buy the wine. The pair proceeded to the Northwestern lagoon, where they sat on the grass and conversed. Defendant drank some of the wine he had purchased; the complainant had only a sip.

After about an hour, defendant tried to kiss the complainant. She pulled away and said, "Let's go home." At about 11 p.m., the parties returned to defendant's car—a 1979 Toyota Celica coupe—and headed for the south side. Defendant stopped the car several times on the return trip. The first stop was in Evanston, where defendant pulled to the curb and resumed the conversation. After a short time, defendant began driving again. He stopped briefly near La Rabida Hospital on the south side. Defendant next stopped at a gas station where he used the men's room. A few blocks later, defendant again pulled to the curb. By this time, they were in the complainant's neighborhood. Defendant again tried to kiss the complainant and the complainant again resisted. She opened the car door and began to exit, telling defendant she would walk home, a distance of several blocks. The complainant testified that defendant responded, "Don't be a fool," and said he would drive her home. The complainant put her foot back in the car and closed the door.

Defendant then drove a short distance and pulled into an alley. When the complainant asked why he was stopping in the alley, defendant responded, "I like you. I like your background. I think you are beautiful. And you are irresistible. And I want some of your pussy." The complainant said, "No. Oh, no," and tried to open the car door. Defendant reached over and grabbed the complainant's arm. After several demands that she disrobe, defendant began forcibly removing her clothing. During this struggle, defendant moved a lever and dropped the complainant's seat back to the fully reclined position.

When his initial attempts to undress the complainant proved unsuccessful, defendant forced her to perform oral copulation. He did this by holding her by the hair and forcing her head onto his exposed penis while prying open her jaw with his hand. Defendant thereafter pushed the complainant back on the reclined seat and succeeded in removing her

clothing, which consisted of a pullover blouse, a bra, a skirt, slip, and panties. Defendant got on top of the complainant, forced her legs apart, and performed an act of sexual intercourse. Complainant testified that she struggled and protested vocally throughout this episode.

After the intercourse, defendant returned to his side of the car. The complainant said, "I want to go home," and defendant indicated that he would take her home. The complainant put on her blouse and skirt as defendant drove to a nearby gas station. There, defendant put gas in the car while the complainant collected her clothing and other items. The complainant testified that she considered reporting the rape to the gas station attendant but decided not to when she saw him conversing with defendant.

Defendant asked the complainant if she had to go to the bathroom but she declined, saying she preferred to wait until she got home. Complainant did not leave the car while at the gas station. Defendant then drove out of the station, went a short distance and turned into another alley. Complainant protested, saying she thought defendant was going to take her home. She also stated she had to go to the bathroom. Defendant allowed her to relieve herself. He escorted her from the car and, maintaining constant physical contact, watched as she relieved herself behind the car. He then led her back to the car, where he again forcibly removed her skirt. After failing in an attempt to remove the complainant's blouse, defendant again grabbed the hair on her head and forced her head down on his penis. When he had completed this oral-genital contact, he pushed the complainant back onto the passenger seat and, when she continued to cry and plead, clapped his hand over her mouth. He then pulled her blouse off, forced her legs apart and performed a second act of sexual intercourse.

The car was parked at this time in an alley behind 7527 South Jeffrey. Curtis Hardaway III, a resident at that address, testified that he was awake at 2:30 a.m. on the morning of July 14 and heard what he thought was a baby crying in the alley. He also heard a female voice say, "Somebody help me." Curtis called the police and awakened his parents, Curtis and Yvonne Hardaway. Curtis' father, Curtis Hardaway, Jr., went on the back porch and called out, "What is going on?" or "Is everything all right?" He then walked toward the car he saw in the alley. Yvonne Hardaway followed.

After Curtis Hardaway called out from the back porch, defendant tried to start the car. The complainant opened the car door and attempted to exit. Defendant reached over and pulled the door shut while the complainant's right foot was outside of the car. After a brief struggle, the complainant withdrew her foot and defendant closed the door. Defendant again attempted to start the car. While he was thus distracted, the

complainant clambered out the window on the passenger side of the car. Mr. Hardaway testified that the car was just beginning to move when the complainant jumped out. The car moved a few feet before the engine died. Nude, the complainant ran toward Mr. and Mrs. Hardaway. Yvonne Hardaway testified, "I asked her did he rape her. She said, 'Yes.' And I asked her, did she know him? She said, 'I thought I knew him.' "

The complainant asked Mr. Hardaway to get her clothing from the driver of the car. Hardaway went to the side of the car and took some articles of clothing from defendant. Mr. Hardaway noted that the passenger seat was in the fully reclined position and the driver's seat was partially reclined. After defendant failed in his attempts to start the car, he got out of the car, nude from the waist down. According to Mr. Hardaway, defendant "slugged around" for two or three minutes before putting his pants on. The police arrived a few minutes later.

The complainant was taken to South Shore Hospital and examined by Dr. Dedra Young. Dr. Young's report, admitted by stipulation, recited that the complainant denied physical injury and appeared to be "in a state of non-distress and alert." The complainant testified that she didn't report her ankle injury at the hospital because she was "still shook up, shocked." Edward Stern, an assistant State's Attorney assigned to the felony review unit, interviewed the complainant in the early morning on July 14. He testified that her ankle was bruised and swollen.

Defendant also testified. Needless to say, his account of the events in the two alleys differs from that of the complainant. Defendant stated that, in the first alley, the parties kissed and caressed and the complainant removed her own clothing and voluntarily engaged in sexual intercourse. After completing the act, defendant noticed that the complainant was crying. She said, "I didn't want it to happen this soon." Defendant then drove to a gas station and, after buying gas, drove into a second alley. Defendant there told the complainant, "I'd really like to make love to you again." Defendant testified that the complainant voluntarily removed her clothing for the second time, but began crying before the two could undertake any sexual activity. The complainant told defendant that he didn't respect her and would probably never see her again. When he heard a man call out from the porch of a nearby building, defendant tried to start the car. At this time, the complainant, still nude, left the car.

Defendant acknowledges that a single act of intercourse took place. He denies the use of force and denies that any oral intercourse occurred. He argues that the complainant left the car because she was upset and embarrassed at having been discovered under those circumstances. Defendant suggests that the complainant merely acquiesced in Yvonne Hardaway's suggestion that a rape had occurred.

The State, in its case-in-chief, introduced evidence of two other al-

leged rapes committed by defendant. Over defendant's objection, the State called two young women. Each testified that, on her first date with defendant, he forced her into an act of sexual intercourse. Both of the alleged rapes had occurred in defendant's apartment. One incident occurred in August 1979 and the other in January 1978. Defendant admits to intercourse with both women but maintains the acts were consensual.

Defendant's appellate brief contains several purported issues, which we find are reducible to two. Defendant maintains he was not proved guilty beyond a reasonable doubt and the trial court erroneously admitted evidence of the earlier alleged rapes.

There is no dispute as to identity and defendant admits that he had sexual intercourse with the complainant. The principal issue for the trier of fact was whether the complainant consented to the acts charged. The issue of consent (or lack thereof) is ultimately a matter of credibility, a question best left to the trier of fact who heard the evidence and saw the demeanor of the witnesses. (*People v. Thompson* (1978), 57 Ill. App. 3d 134, 141, 372 N.E.2d 1052.) A reviewing court will not upset the findings of the trier of fact unless the evidence, on the whole, is so unsatisfactory as to raise a reasonable doubt concerning the defendant's guilt. *People v. Thompson* (1978), 57 Ill. App. 3d 134, 141.

Despite defendant's contrary belief, we perceive no inherent improbability in the complainant's story. The complainant agreed to go out with the defendant, knowing him to be an attorney and an assistant public defender. If the complainant's testimony is believed, the first act of intercourse was forced and nonconsensual but the complainant was not injured and could have believed that defendant would not attack her again and would carry out his promise to take her home. The complainant's decision not to flee the car at the gas station was unwise but not so unbelievable as to destroy her credibility. Complainant's story is certainly no more improbable than defendant's explanation of the complainant's conduct in the second alley: that she ran nude from the car and into the arms of strangers because she was embarrassed at having succumbed to seduction so readily.

■■ Defendant argues that the complainant's clothing was not torn and there was no proof of force. There is no absolute standard setting the amount of force required to establish a rape. (*People v. Sims* (1972), 5 Ill. App. 3d 727, 729, 283 N.E.2d 906.) Each case must be considered on its own facts. It is proper to consider the disparity in the size and strength of the parties and the conditions under which the act took place. (*People v. Sims* (1972), 5 Ill. App. 3d 727, 729.) Defendant here is not a large man, but the record shows he had a 25-35 pound weight advantage over the complainant. Further, the acts took place in defendant's car in dark and

deserted alleys. Defendant strenuously argues that a forcible disrobing and a forcible rape could not have occurred in his car, a small Toyota Celica. This, too, was a matter for the trier of fact. Photographs of the interior of the car were introduced into evidence. The trier of fact might well have relied on the testimony that the car's seats were reclined, a condition not shown in defendant's photographs.

■■ The testimony of the complaining witness, if clear and convincing, is enough to support a conviction for rape. (*People v. Secret* (1978), 72 Ill. 2d 371, 376, 381 N.E.2d 285.) In the case at bar, the record shows that the complainant's testimony was clear; the trial court found it convincing. Her story is corroborated by a prompt complaint that she was raped. Defendant argues that the complaint was not prompt in that the complainant said nothing to the gas station attendant. A rape victim is not required to make an outcry to the first stranger she meets after the rape (*People v. Jones* (1976), 40 Ill. App. 3d 850, 857, 353 N.E.2d 375), and there is no fixed time limit within which a prompt complaint must be made. (*People v. Secret* (1978), 72 Ill. 2d 371, 377.) Defendant also asserts that the outcry was not voluntary, in that it was made in response to the question, "Did he rape you?" Given the circumstances, Yvonne Hardaway's question was entirely reasonable. Mrs. Hardaway had just seen a nude and visibly upset female run toward her from a car in a darkened alley. No purpose would be served if a rape victim could be deprived of the probative value of a prompt complaint simply because a stranger asked about the rape before the victim could compose herself and report it. In any rape prosecution, the circumstances of the complainant's outcry must be assessed in weighing credibility. In the instant case, the circumstances were properly before the trier of fact. We have reviewed the record and conclude that the admissible evidence was more than sufficient to support defendant's conviction.

Defendant also contends that the trial court improperly admitted evidence of other crimes, *i.e.*, the two earlier alleged rapes. (No charges were brought in those cases.) The State acknowledges the general rule that evidence of crimes not charged in the indictment is inadmissible. (See *People v. McDonald* (1975), 62 Ill. 2d 448, 455, 343 N.E.2d 489.) The State maintains, however, that the evidence in question was proper under an exception to that general rule. The State argues that the earlier rapes show a common design or *modus operandi*.

The State (and, indeed, some of the authorities) have used "common design" and "*modus operandi*" interchangeably but the concepts are quite distinguishable. A common design refers to a larger criminal scheme of which the crime charged is only a portion. *Modus operandi* means, literally, "method of working," and refers to a pattern of criminal be-

havior so distinctive that separate crimes are recognizable as the handiwork of the same wrongdoer. (See generally McCormick, Evidence sec. 190, at 448-49 (2d ed. 1972).) A common design is frequently relevant to show the motive for the crime charged. *Modus operandi* is most useful in showing that the accused is the perpetrator of the crime charged.

■■ ■ There is no reason to believe that the alleged rapes are part of a common scheme. In arguing that the rapes share a *modus operandi*, the State lists approximately 19 similarities among the crimes. Some of the purported similarities are irrelevant coincidences (*e.g.*, none of the women drank heavily) and others are merely descriptive of the crime of rape (*e.g.*, force was used in all three attacks). While a showing of *modus operandi* does not require that the similarities be unique to the offenses being compared, there must be "some distinctive features that are not common to most offenses of that type." (*People v. Tate* (1981), 87 Ill. 2d 134, 142-43, 429 N.E.2d 470.) In the case at bar, the State has simply failed to make the "strong and persuasive showing of similarity" required to demonstrate *modis operandi*. (*People v. Tate* (1981), 87 Ill. 2d 134, 141.) The State's lengthy list of purported similarities does not establish that the three alleged rapes were "so nearly identical in method as to earmark them as the handiwork of the accused." McCormick, Evidence sec. 190, at 449 (2d ed. 1972).

■■ Even if the State had shown a distinctive pattern of criminal behavior, the evidence would still be inadmissible. The State appears to assume that when a clear *modus operandi* has been shown, evidence of other crimes employing the same *modus* is automatically admissible. This assumption is incorrect and ignores a fundamental rule of evidence: "Whatever is *relevant* is admissible." (Emphasis added.) (*People v. Gray* (1911), 251 Ill. 431, 439, 96 N.E. 268.) To be relevant, a given fact must tend to make a proposition at issue either more or less probable. (See *People v. Gray* (1911), 251 Ill. 431, 439.) Relevance is the touchstone of admissibility and defendant's other crimes, even those sharing a common *modus operandi*, are inadmissible unless the State shows that the evidence is probative of a proposition at issue.

■■ The State maintains that the prior rapes help to establish the offender's identity. This claim is preposterous. Defendant admitted to intercourse with all three women. His identity was never in issue. The State also argues that the defendant's *modus operandi* demonstrates the complainant's lack of consent to the acts charged. This claim, too, is illogical. That two of defendant's former victims testified that they did not consent to defendant's sexual advances is wholly irrelevant to this issue of *this* complainant's consent.

■■ As noted above, the issues of force and consent are questions of

credibility. (*People v. Thompson* (1978), 57 Ill. App. 3d 134, 141.) In *People v. Romero* (1977), 66 Ill. 2d 325, 329-32, 362 N.E.2d 288, our supreme court rejected the State's argument that evidence of other crimes was admissible as probative of the credibility of the witnesses. The trial court in the case at bar stated that the disputed evidence was not admitted for the purpose of proving credibility. Rather, the court found the evidence of the other rapes relevant to the issue of plausibility. The only example proffered was based on defendant's argument (in moving for a new trial) that it was unlikely that a rapist would demand both oral and genital intercourse. The trial court observed that the victim of one of the earlier alleged rapes had testified that defendant demanded both oral and genital sex and this testimony was relevant to the plausibility of the instant complainant's account. This rationale is, at best, strained. Evidence of other crimes cannot be admitted if the basis for establishing the relevance of those crimes is speculative. (*People v. Lindgren* (1980), 79 Ill. 2d 129, 140, 402 N.E.2d 238.) "The law distrusts the inference that because a man has committed other crimes he is more likely to have committed the current crime." (*People v. Lehman* (1955), 5 Ill. 2d 337, 342, 125 N.E.2d 506.) Where testimony has no value beyond the inference that the defendant has a propensity for the crime charged, the testimony is excluded. (*People v. Lehman* (1955), 5 Ill. 2d 337, 342.) Where, however, such testimony is independently relevant and shows motive, intent, identity, absence of mistake, or common design, the testimony is admissible. (*People v. Lehman* (1955), 5 Ill. 2d 337, 342-43.) We find that no proper purpose was served by the admission of the questioned evidence, and the trial court erred in allowing the testimony.

■■ The next question is whether that error requires reversal. Defendant was convicted in a bench trial. Where trial is had without a jury, there is a presumption that the trial court considered only competent evidence. That presumption can be overcome where the record affirmatively shows the contrary. (*People v. Gilbert* (1977), 68 Ill. 2d 252, 258-59, 369 N.E.2d 849.) The circumstances of defendant's trial suggest that the trial court must have considered the incompetent evidence. First, the *modus operandi* issue was strenuously contested at every stage of the litigation— at a motion *in limine*, during the trial and in the post-trial motion. The question was briefed and argued at length. Although we have not detailed the testimony of the victims of the prior alleged rapes, that testimony was extensive, comprising (as measured by pages of trial transcript) approximately 52% of the State's case. In all likelihood, the trial court would not have admitted this testimony unless he believed it to have some probative value. We have held, however, that the evidence had no permissible use in the instant case. (*Cf. People v. Fair* (1977), 45 Ill. App. 3d 301, 306, 359

N.E.2d 848 (trial court admitted improper evidence over defendant's objection; this fact negates the presumption that the court did not consider the incompetent evidence).) We must conclude that the evidence could only have been considered for an impermissible purpose.

The record contains many comments by the trial court and we are reluctant to interpret those comments out of context. Nevertheless, one statement suggests that the trial court did in fact consider the other crimes evidence for impermissible purposes. Shortly before finding defendant guilty, the court said:

"First, a word about the *modus operandi* evidence offered by the State and countered by the defense. The sole relevant purpose in adducing such evidence was to negate some such proposition as 'regardless of the evidence, it is unthinkable that a defendant of the caliber of this defendant would ever commit such acts.'"

This statement appears to mean, "The disputed evidence was admitted solely to rebut the proposition that this defendant is too honorable to have committed a rape." This is perilously close to saying, "The disputed evidence shows that this defendant has, despite his distinguished background, a propensity to commit rape." We have held that evidence of other crimes admitted solely to show a propensity to crime is sufficiently prejudicial to require reversal. (See *People v. Connors* (1980), 82 Ill. App. 3d 312, 317, 402 N.E.2d 773.) It is, of course, not completely clear that the trial court admitted the evidence for such purpose. Nevertheless, the admission was error, and this court has held that error cannot be harmless if there is a reasonable possibility that the incompetent evidence contributed to the conviction. (See *People v. Bryant* (1981), 100 Ill. App. 3d 17, 27, 425 N.E.2d 1325.) We also note that in denying defendant's post-trial relief, the trial court again relies upon the *modus operandi* evidence by discussing its weight, not its exclusion and said: "In stating that the court did not consider it probative of which version of the facts was closer to the truth, the Court was merely indicating that if the testimony of the complaining witness had not been fully credible to establish the commission by the defendant of *these three offenses*, no amount of modus operandi evidence could make up for that lack. Its relevance then lies in the testing of that credibility, as the Court must, against every argument of implausibility, illogic and apparent contradiction." (Emphasis added.) We find that the error was not harmless and that the comments and rulings of the trial court have rebutted the presumption that the incompetent evidence was not considered by the trial court.

We have found the testimony of the complainant and the Hardaway family sufficient to support defendant's convictions for rape and deviate sexual assault. We reverse those convictions, however, because of the

prejudicial effect of evidence of other rapes allegedly committed by defendant. The cause is remanded for a new trial.

Reversed and remanded.

HARTMAN, J., concurs.

JUSTICE DOWNING, concurring in part and dissenting in part:

I concur with my colleagues that the testimony of the two other incidents should not have been admitted. The trial court was told by defendant's counsel before trial that the defense would be "consent." Therefore, the only real issue at trial was that of the credibility of the parties. The evidence of other crimes, generally inadmissible, could not be appropriately admitted here under the *modus operandi* exception to resolve that credibility issue.

My colleagues determined that this improperly admitted evidence was reversible error. This was a bench trial. I have read the remarks of the trial court (i) when it initially decided to admit the erroneous evidence, (ii) at the conclusion of the trial, and (iii) when it resolved the post-trial motion. At page 1002 of the majority opinion is quoted a portion of the trial court's remarks upon the finding of defendant's guilt. It is helpful to consider as well those comments of the court which immediately followed that quoted material:

" 'First, a word about the *modus operandi* evidence offered by the State and countered by the defense. The sole relevant purpose in adducing such evidence was to negate some such proposition as "regardless of the evidence, it is unthinkable that a defendant of the caliber of this defendant would ever commit such acts." ' "

"It was for that limited purpose that it was admitted, *and was not considered probative by the Court on the issue of whether the version of facts recounted by the Defendant or by the State's witnesses were closer to the truth.*" (Emphasis added.)

In my opinion, the record satisfactorily demonstrates that the erroneous evidence was not considered by the trial court in its resolution of the central issue of the case: the question of credibility of the complainant's and defendant's testimony in relation to the consent issue. The trial court satisfactorily indicated that the erroneous evidence was "received as evidence of defendant's *modus operandi.*" I cannot interpret anything said by the trial court, as trier of fact, which suggests any confusion or uncertainty on its part through the use of this *modus operandi* evidence to resolve the credibility issue.

In this bench trial, I find the evidence of defendant's guilt over-

whelming. It shows beyond a reasonable doubt that defendant was guilty of the offenses charged in the indictment. I do not find any prejudice to defendant which would require reversal. The record demonstrates the defendant received a fair trial. I would therefore affirm the conviction. *Cf. People v. Armstrong* (1961), 22 Ill. 2d 420, 424, 176 N.E.2d 755; *People v. Martin* (1979), 80 Ill. App. 3d 281, 294, 399 N.E.2d 265, *appeal denied* (1979), 79 Ill. 2d 623.

In reaching my conclusion, I have taken into consideration the entire record in the trial court and the rights of the defendant, as well as the not insignificant interests of the complainant and of society. In weighing all of these factors, it is my opinion that the administration of justice does not require a new trial.