THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JESUS SANCHEZ, Defendant-Appellant.

First District (5th Division)   No. 1—86—2720

Opinion filed November 16, 1990.

92

Paul P. Biebel, Jr., Public Defender, of Chicago (Emily Eisner, Assistant Public Defender, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund and James E. Fitzgerald, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE COCCIA delivered the opinion of the court:

## INTRODUCTION

Following a bench trial, the circuit court found defendant Jesus Sanchez guilty of murder and sentenced him to 34 years in the Illinois Department of Corrections. In this court, Sanchez challenges his conviction and sentence on numerous grounds. We affirm for the following reasons.

## BACKGROUND

On November 19, 1985, Sanchez was indicted for the offense of murder, which was then defined as follows:

"(a) A person who kills an individual without lawful justification commits murder if, in performing the acts which cause the death:

(1) He either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another *** ." (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(1).)[1]

The State alleged that Sanchez, without lawful justification, intentionally and knowingly killed Gerardo Gentil with a pipe on October 18, 1985.

Trial began on July 2, 1986. Following opening statements, Carlota Gentil testified through an interpreter conversant in the Spanish language. Mrs. Gentil stated that on October 17, 1985, she and her 31-year-old husband lived on the second floor of a three-story building at 2216 South Spaulding in Chicago. With them lived their two children, her brother-in-law, and his wife. On October 17, Gentil left for work about 2:20 p.m., taking his lunch box and keys. He normally returned home by 12:30 a.m. Mrs. Gentil awoke at 6 a.m. on October 18. She found her husband, "full of blood," on the ground in their backyard, with his head on the cement. Mrs. Gentil hugged her husband, and tried to move him, but he was very stiff. His lunch box and keys to the back door of the house were in his hands. The keys

---

[1]The offense formerly defined as murder is now defined as first-degree murder; similarly, voluntary manslaughter is now defined as second-degree murder. See Ill. Rev. Stat. 1987, ch. 38, pars. 9—1, 9—2.

were in his right hand, and his finger was through the key ring. He had another set of keys, for their garage, with him. Mrs. Gentil testified that between midnight and the time she found her husband, she heard no noise from their backyard.

On cross-examination, Mrs. Gentil admitted that she was sleeping between midnight and 6 a.m. The Sanchez family had moved next door four or five years earlier, into a house at the back of the lot in the yard. The family had never been in her home as guests. Mrs. Gentil conceded that she had only been in the Sanchez home once, to tell Sanchez's mother that he was causing problems.

Rachel Salazar was the State's next witness. Salazar stated that she was 12 years old. She identified Sanchez, whom she knew by the name "Worm," in open court. On a Saturday afternoon approximately three weeks before Gentil's death, Salazar had been sent by her mother to get money for diapers and milk from her stepfather. It was still light. Salazar found her stepfather and five friends, including Gentil, at the house next door to the Gentils' house. They were standing in front of the house. After getting the money, Salazar saw Sanchez on her way home. He stopped her and asked if she knew "them guys and I told him yeah." Sanchez made a movement with his chin in the direction of her stepfather, Gentil, and their friends. Salazar pointed to them and responded affirmatively. Sanchez then said "One of these days I'm going to get rid of all these f---ing braziers." Salazar testified that the term "braziers" meant Mexican immigrants. Sanchez objected to this testimony on the grounds of relevance, but the circuit court overruled his objection.

On cross-examination, Salazar admitted that she did not recall when she told her mother about the incident. Gentil was a friend of her mother and stepfather. She had never had a conversation with Sanchez before. She and Sanchez were less than one block from her stepfather, Gentil, and the others when they had the conversation. Salazar could see the entire group from where she and Sanchez were talking. His exact words, as best she could recall, were that he was "going to get rid of all the f---ing braziers." After hearing this, she left and walked away. Salazar testified that she never had another conversation with Sanchez. Sanchez renewed his motion to strike her testimony, and the circuit court overruled him again.

The State then called Chicago police officer James Ruhnke. Officer Ruhnke stated that he was on duty the morning of October 18. He was dispatched to 2216 South Spaulding at 6:10 a.m. He found the body of a man near the garage, closer to the garage than the house. Officer Ruhnke also found an orange and white baseball cap, along

with a gym bag. The gym bag was located to the left of the victim, near his feet. Two fire department personnel were checking him for vital signs. Officer Ruhnke noticed a wound on the victim's head. He testified that it was his duty to protect the scene and make sure nothing was disturbed. On cross-examination, Officer Ruhnke admitted that he did not recall finding or recovering keys from the victim.

Chicago police detective Dennis Keane testified for the State. Detective Keane stated that on October 31, he and his partner, Detective Greg Baiocchi, were investigating the Gentil homicide. They went to Sanchez's home, at 2220 South Spaulding, where they met his mother. They left a business card with her and received a call from Sanchez in the morning of November 1. They returned to Sanchez's home about 10 a.m. that same day. Sanchez, whom Detective Keane identified in open court, agreed to accompany them to Area 4 Violent Crimes, at Harrison and Kedzie. After bringing Sanchez to the interview room, they gave him the *Miranda* warnings. According to Detective Keane:

"We informed him [Sanchez] his name had come up in our investigation as a possible offender. And at that point he told us that he heard the same thing, that he understood on the street from a friend of his that he was involved along with two black guys, by the name of Thurman and Tony, and that these two black guys were seen leaving the area in a black vehicle.

* * *

He told us that on the evening of the homicide, which was the 17th, he was on the street with his brother. They were out walking the family dog, that they returned to the house approximately 10:30 that evening, they went up on to the—back into the house up on the second-floor bedroom. They both listened to some music and he fell asleep.

* * *

The only thing he knew was the next day, the next morning, between 6:00 and 6:30, he heard some screaming. He got up, along with other family members, and that they found out that the neighbor had been killed.

The next day he found out that he was supposedly involved in it."

Sanchez voluntarily accompanied Detective Keane and his partner to police headquarters, at 1121 South State, around 2:30 p.m. Detective Keane testified that about 4:45 p.m., on the fifth floor, they had another conversation with Sanchez. They again advised him of his constitutional rights. Detective Keane stated:

"I first informed him [Sanchez] that I didn't believe what he

was telling us, I thought he wasn't being truthful with us, that he knew more about what had happened.

And at that point he told us that he was in fact out there the night that his neighbor had been killed and that it was a male black by the name of T-Bone, that T-Bone had done it.

\* \* \*

He stated that he works at Burger King downtown, and he had met T-Bone at the Burger King. T-Bone had come around several times and he got to know him from him coming in.

That from knowing him he had told T-Bone that he was having problems with a neighbor. And T-Bone had informed him that he would take care of it, but that Sanchez would have to give T-Bone the time that his neighbor got home.

At that point Sanchez gave T-Bone his own phone number and told T-Bone to call him at home and that he would let him know when the neighbor got home every night.

\* \* \*

He stated on October 17th T-Bone did in fact call him at home and that he told T-Bone that the neighbor got home about midnight, about 12:00 o'clock midnight, and that he would be waiting for him out in the alley when T-Bone arrived.

\* \* \*

He said that he was out in the alley when T-Bone arrived, and that he pulled up in a car and that they both waited for the neighbor, Gentil, to come home, and that he, when Gentil came home, parked his car in the garage, and was leaving the garage when Gentil was then approached by T-Bone. T-Bone walked into the yard and approached Gentil.

At this point there was a fight, a fist fight, and T-Bone knocked Gentil to the ground.

He then observed T-Bone walk back to the car and at this time he takes a paper bag from another male black, who had been sitting in the car. He takes that out of the car and he walks back into the yard, where Gentil had been knocked to the ground, and was still on the ground. From the paper bag he removed a hatchet. He sees T-Bone remove a hatchet and he then strikes Gentil one time on the top of the head.

\* \* \*

He stated that at that point he got scared, so he ran around to his entrance of his house, up the stairs to the second floor, and he looked out his bedroom window. At that point he said he sees T-Bone strike the victim again in the head with this

hatchet. T-Bone then leaves the area.

\* \* \*

\*\*\* [H]e said that he didn't think T-Bone was going to kill him. He just thought that T-Bone was going to beat him up and take his money."

Detective Keane testified that he and his partner then arrested Sanchez, and they returned to Area 4, where he was again advised of his rights. Detective Keane and his partner noticed certain contradictions and inconsistencies in Sanchez' second story, and they informed him of this. Sanchez told them he wanted time to think things over. They left the room for a while and, upon their return, Sanchez confessed. They then were joined by an assistant State's Attorney (ASA), who had a conversation with Sanchez during which he confessed to killing Gerardo Gentil. Following this conversation, the ASA wrote down Sanchez's confession on a form. After reading his confession, Sanchez signed it, as did the ASA, Detective Keane, and his partner. Detective Keane read the confession in court:

"After reading, Jesse [Sanchez], his rights, per Miranda, and telling him that I am an Assistant State's Attorney working for the police and not his attorney he stated the following in summary but not verbatim.

That on Thursday, October 17, he went to a store at about 11:45 p.m. to talk to the owner. He left that store about ten minutes later to go home. He walked down the alley to his gate, but it was locked. He then went next door to Genardo's [sic] house to use his gate and went into Genardo's [sic] yard. He stated that he closed the gate and began walking in Genardo's [sic] yard, when Genardo [sic] said what are you doing here. Genardo [sic] then approached him and slapped him in the face. He then started fighting with Genardo [sic]. Genardo [sic] did not have anything in his hands when he approached Jesse. Genardo [sic] then swung him to the ground but then let him up. When he got up he picked up a brick and threw it at Genardo [sic], striking Genardo [sic] on the right side of the neck and hand.

Genardo [sic] still approached him and he picked up a pipe in the yard and struck Genardo [sic] on the left side of the head. Genardo [sic] fell to the ground and he hit Genardo [sic] with the pipe on top of the head while Genardo [sic] was on the ground.

He tried to wake up Genardo [sic], and then threw the pipe into his yard, and he jumped the fence, picked up the pipe, and

wiped it clean with his shirt and took the pipe to his room.

The next day he took the pipe and got rid of it by throwing it into Colonial Brick.

He told [*sic*] that he could read and write English.

He also stated to me that Genardo [*sic*] was swearing at him prior to being slapped and Genardo [*sic*] was swearing in Spanish."

On cross-examination, Detective Keane stated that the fence behind Sanchez's home was higher than the fence between Sanchez's home and Gentil's property. Detective Keane conceded that Sanchez had behaved in a courteous and polite manner during the questioning. About 11 hours elapsed between the time he and his partner went to Sanchez's home in the morning of November 1 and the time the latter confessed. After the confession they brought Sanchez to Cermak and Christiana, where Colonial Brick was located. Detective Keane testified that they were unable to find the pipe Sanchez mentioned in his confession.

Detective Angelo Rinchiuso testified for the State. He stated that he investigated Gentil's homicide on October 18. Detective Rinchiuso arrived at 2216 South Spaulding about 6:20 a.m. He found a three-flat building with a yard in back. To the west of the yard was a garage with a service door entrance. The yard was enclosed by fences on both the south and north ends. There was a gangway on 2216, running from the front sidewalk to the rear alley. The yard's dimensions were 25 feet by 30 feet. He found Gentil on his back, about five feet from the garage. Gentil's head was on the sidewalk in a pool of blood, and his feet were facing north while his head was facing south. The rest of his body was on the grass. His blood had coagulated, and the body was stiff and cold. Gentil had several injuries on the left side of his head. To the right of Gentil was a baseball cap, two feet from his head. There was a three-inch gash in the bill of the cap, on its left side, and hair was embedded in the gash. Underneath Gentil's left leg were several keys on a key ring, including a house key and a garage key. Next to his left arm was a blue lunch box or pail. A search of the surrounding area revealed no bricks or pipes. Detective Rinchiuso's inspection of the garage revealed a service door facing east and an overhead door facing west, into the alley. In order to raise the door, one would have to remove a two-by-four block from inside the garage. There were two automobiles in the garage. Detective Rinchiuso testified that the service door had been locked with a key.

On cross-examination, Detective Rinchiuso confirmed that he found Gentil five feet from the service door and 10 to 15 feet from

the house. The lunch pail was not made out of hard material. Detective Rinchiuso stated that the fence behind Sanchez's house was about six feet high, and the fence between his home and Gentil's property was about three or four feet high.

William Daffron then testified for the State. Daffron stated that he was a foreman at the engineering firm where Gentil had worked since 1976. Daffron last saw him about 11:50 p.m. on October 17. Daffron testified that Gentil punched out at 12:01 a.m. on October 18.

The State's last witness was Barry Lifschultz, deputy medical examiner of Cook County. The parties stipulated that Dr. Lifschultz was an expert in the field of forensic pathology. He stated that he performed an autopsy upon Gentil on October 19. Dr. Lifschultz found the following injuries:

> "On the left side of the head in the front there was a laceration or tearing of the skin *** which was three inches by three-quarters of an inch in size.

> Then on the left *back* of the head there was another laceration or tearing of the skin which was four inches by one-half inch.

> Underneath those two lacerations there was subgaleal hemorrhage or bleeding under the surface of the scalp and underneath the scalp, the skull in the front mid portion and *back* of the head was caved in with a depressed skull fracture.

> Underneath the skull fracture there was bruising and there was tearing of the surface of the left side of the brain.

> * * *

> There were several small additional injuries. There was a bruise on the left side of the head. There was an abrasion or scraping away of the skin on the left side of the head and then there was also a linear laceration or cut on the left side of the head.

> Also there was a laceration or tearing of the skin on the left lip. It was the lower lip and there was also bruising on the inner surface of the upper lip.

> Finally, there was also a bite mark on the tongue." (Emphasis added.)

No other injuries were found on Gentil. Blood test results for alcohol, opiums, and metabolid of cocaine were negative. Dr. Lifschultz opined, within a reasonable degree of medical certainty, that Gentil died as a result of cranial and cerebral injury or injuries to the skull and brain due to blunt trauma, consistent with the use of a metal pipe.

On cross-examination, Dr. Lifschultz admitted that there were no injuries to the "back" of Gentil's head, with that term defined as the area directly above the neck. But Dr. Lifschultz stated that there was bleeding on the left back of the head, although not directly over the middle of the neck. There was no additional damage to the back of the head. Dr. Lifschultz conceded that he did not know how the smaller injuries to Gentil's head and face were caused; however, they could have been caused by any blunt instrument. At the time of the autopsy, Gentil was 5 feet 6½ inches tall and he weighed 166 pounds. On redirect examination, Dr. Lifschultz repeated that the injuries to Gentil's face could have been caused by his falling to the ground. The State then rested its case.

After Sanchez's oral motion for a directed finding was denied, Alfredo Miranda testified for the defense. The 20-year-old Miranda stated that he was Sanchez's cousin and that he resided with the latter's family from January until August of 1984. Miranda had met Gentil on several occasions. Over the State's hearsay objection, he testified that Gentil made comments to him and his cousin regarding their black friends Thurman and Thomas in the summer of 1984. According to Miranda, Gentil said that they had no right to bring blacks into the neighborhood and that they were spray painting his garage. Gentil would blame Miranda, Sanchez, and their friends for everything that happened to his house or car. Miranda testified that these comments continued until Gentil was killed.

Miranda stated that in June of 1984, while he was living with the Sanchez family, he and Gentil had a fight. Over the State's relevancy objection, Miranda testified that he, his younger brother Julio, and Sanchez were playing catch with a softball in the alley directly behind Gentil's property. Miranda threw the ball into Gentil's yard, and Sanchez went to retrieve it. Miranda was standing in the alley by the back gate. Sanchez found the ball and began walking out of the backyard. Gentil began to chase Sanchez, and he ran by Miranda. Gentil grabbed a baseball bat and struck Miranda on his side. Miranda took the bat from Gentil and struck the latter on the jaw with his fist. The fight ended when Gentil was held back by another man. Miranda stated that Gentil "told us that if we ever go in his yard again that we would pay for it"; Miranda replied "f--- you." Miranda never had a cordial, polite, or friendly conversation with Gentil, who directed many comments against Sanchez and his family. In the spring of 1985, Miranda stated, he noticed some pipes in Gentil's yard, left over from a gardening project the previous summer.

Jesse Aguilar also testified for Sanchez. Aguilar stated that he

had known Sanchez for three years. He was a teacher of Sanchez's at the University of Illinois' General Educational Development (GED) program. Over the State's objection, Aguilar was permitted to testify that Sanchez was a peaceful and quiet person, who gave him no trouble in class. On cross-examination, Aguilar admitted that he did not know Sanchez's reputation for peacefulness in his neighborhood.

Janelle Smith then testified as a character witness for Sanchez. Smith stated that she was a GED teacher and that Sanchez was a former student of hers. The other students liked him, and he was peaceful and quiet, an ideal student. On cross-examination, Smith conceded that her only knowledge of Sanchez came from the classroom.

Julio Miranda testified for Sanchez. Julio stated that he was Sanchez's 17-year-old cousin. Jesus Sanchez was also known as Jesse. Julio's testimony concerning the fight between his brother Alfredo and Gentil is substantially similar to Alfredo's. However, Julio remembered that the incident took place in July of 1984, rather than in June. On cross-examination, Julio confirmed that Sanchez's nickname was "Worm." Julio admitted that he had never seen Gentil attack anyone, apart from his brother.

Sanchez himself then testified. Sanchez stated that he was 18 years old in October of 1985. At that time, he was attending GED classes and working in a Burger King at Sears Tower. Sanchez's account of the fight between Miranda and Gentil is similar to his cousins', including Gentil's statement that he did not want to see them in his yard again. Other than this incident, Sanchez never spoke with Gentil until the night he killed his neighbor. Sanchez's testimony concerning Gentil's statements to him, his cousins, and their friends is also consistent with the Mirandas'. According to Sanchez, Gentil was never friendly to them.

Sanchez stated that, around midnight on October 18, he was on his way home after searching unsuccessfully for his friends. He found himself in the alley behind his home. The gate was locked, and he was reluctant to climb the high fence. He decided to take a shortcut through Gentil's yard, which Sanchez had done before without his neighbor's knowledge. Instead of taking the shortcut, Sanchez admitted, he could have gone down the alley and around to the front of his house. After entering Gentil's yard through the gate, Sanchez heard the sound of keys and saw Gentil standing by his garage. He asked Sanchez what the hell he was doing there. Sanchez replied that he was taking a shortcut. Gentil slapped him in the face. Sanchez became dizzy, put his head down, and pushed Gentil back. Gentil hit him on the chest, and as he was falling, Gentil punched him in the stomach.

While he was on the ground, Gentil kicked him. Sanchez found a brick and threw it at Gentil. He did not know whether he struck Gentil, but saw the latter with his arm over his face. Sanchez tried to get away, over the opposite fence, but Gentil knocked him down from behind. Sanchez was frightened because Gentil was larger than he was. Afraid that Gentil would hurt or kill him, Sanchez picked up a pipe. Gentil approached him, and he backed up. Sanchez closed his eyes and began swinging. When he opened his eyes, Gentil was on the ground. Sanchez was still scared. Gentil looked like he was about to get up and hit him again or grab something, so Sanchez hit Gentil with the pipe again—while his neighbor was on the ground—and ran home. Sanchez hid the pipe under his bed, but he was too frightened to sleep. He did not realize how badly he hurt Gentil, thinking instead that the latter was unconscious. The next morning Sanchez heard screaming. He did not mean to kill Gentil and would not have struck him if Gentil had not struck the first blow. Sanchez conceded that he did not tell the police the truth initially. Sanchez claimed that he had bruises on his back after the fight, which were caused by Gentil's kicks. Sanchez stated that the police did not ask to see his bruises. It is not clear from the record, however, that Sanchez told the police he was bruised.

On cross-examination, Sanchez confirmed that his nickname was "Worm." Sanchez conceded that he and Gentil did not like each other. Before confessing to the police, Sanchez testified, he told them that he told "T-Bone" that he was having problems with Gentil. Sanchez admitted that he knew Gentil did not want him in the yard, and he knew the yard was completely enclosed. His only excuse for cutting through Gentil's yard was that he did not wish to take the long way around. Gentil was unarmed during the incident. Sanchez stated that he was right-handed. Gentil was facing Sanchez when he struck his neighbor with the pipe. Sanchez repeated that Gentil was on the ground, when he hit the latter a second time with the pipe. Sanchez's eyes were open for the second blow. Sanchez never went to the hospital to be treated for his alleged injuries. He never saw Gentil's lunchbox. Sanchez never told the police that he tried to escape over the opposite fence. During the entire incident, Gentil was swearing at him in Spanish. Sanchez was too scared to yell for help, and no one heard Gentil yelling at him. After hitting Gentil the second time with the pipe, Sanchez shook him to see if he was awake. As Gentil failed to wake up, Sanchez concluded that he was unconscious. Although Gentil appeared to be injured, Sanchez left his neighbor in that condition, afraid that he would get up again. When he got home, Sanchez told

no one of Gentil's condition because he was frightened. But Sanchez conceded that he was not afraid to throw the pipe away at Colonial Brick, in order to dispose of it. Finally, on redirect examination, Sanchez testified that he was 5 feet 5 inches tall and weighed 145 pounds in October of 1985.

Lastly, Alfredo Miranda was recalled as a character witness for his cousin. Miranda testified that Sanchez was a very quiet, peaceful, and law-abiding person. On cross-examination, Miranda confirmed that his cousin was also known by the name of "Worm" in the neighborhood.

Following closing arguments, the circuit court found Sanchez guilty of murder. The circuit court stated:

"The court has considered the arguments of counsel and the evidence heard on the trial of this case, and the Court has considered not what was close to the evidence but what the evidence was.

The court finds that after a long period of animosity between the victim and the defendant, and other people of the defendant's household, that it is not credible or reasonable to believe that the defendant, at midnight, entered the enclosed yard of the victim, who had been his antagonist and enemy over a long period of time.

It's not reasonable to believe that the defendant would have entered this enclosed yard at midnight for any lawful purpose.

There's no evidence of any kind of any running around or a chase or a struggle in this yard. There is evidence that the victim was struck with a great and killing force, struck with mortal wounds, with a killing instrument, heavy pipe.

That the victim was but a few feet from his garage door, that he was holding evidently a lunch bucket and keys, which were found in his hand or near his hand, which, quite evidently, dropped when he was struck.

Had there been any kind of running around or chase, it's inconceivable that the victim would have been carrying his keys and lunch bucket during the chase.

The Court believes that the evidence establishes beyond a reasonable doubt that the defendant, Jesus Sanchez, is guilty of murder of Gerardo Gentil and the Court so finds."

After the denial of Sanchez's motion for a new trial on September 29, 1986, a sentencing hearing was held. The circuit court admitted a victim impact statement signed by Mrs. Gentil, over Sanchez's objection that certain statements in it were prejudicial. The statement in-

cludes the following remarks by Mrs. Gentil:

"[M]y daughter Fanny has been upset with the death of her father. The school contacted me so they can seek counseling for her. I have filled some form[ ]s so they can seek help for her[ ]. She is always crying due to the death.

\* \* \*

\*\*\* [I]t has affected my family and I[ ], my husband supported my family and me. Since then I had to move into my sister in law['s] home. They have had to support my two children and me. I had applied for Sociel [sic] Security from my husband['s] benefits. I can['t] work because I have to stay with my children, have been in shock[ ], they saw there [sic] father lying on the ground dead in a [sic] of blood.

\* \* \*

I had to move from my place of residence. Our lifes [sic] have changeed [sic] the killing of my husband will effect [sic] us for the rest of our lives.

\* \* \*

I can't eat I feel like a prisoner in my own home. I fear for the safty [sic] of my family and me[ ], I can't sleep or cope with every day life[ ]. I also fear for the defendant family because I think that they might hurt my family or me.

\* \* \*

I would like for justice's [sic] to be done, I wouldn't want this man to go free to hurt my family or me. For example if the murder [sic] of my husband got fifty years in jail I wouldn't be satisfied [ ], my husband['s] life was worth more than that. I see it as a life for a life[ ], the dead [sic] sentence is what he deserves. This should be an example to every one who takes a precious life away for no reson [sic] or cause. The damage this murder has done to our family, entire family. He has left my children with out a father or me a husband. The pain and nightmare will never end it will last a life time, and for that reason my family and I have attented [sic] each and every court session because we want justice done."

After the parties presented evidence in aggravation and mitigation, Sanchez expressed remorse. The circuit court then stated:

"The Court has considered the presentence report, the victim impact statement, the statements of Counsel, the statement of the defendant, and the evidence heard on the trial of this case which the Court found was uncalled for and vicious and brutal attack upon the victim in his own yard. Whatever prompted the

defendant, evidently, the animosity referred to by Counsel that built up over a period of time resulted into this regrettable act.

The Legislature has fixed the penalties for murder and has left it within certain bounds for the Court to determine in each case. The Legislature has set a number of factors for the judge to consider in setting the penalty in each homicide or murder case. The Court has considered all of those statutory suggestions, and the Court affixes the penalty in this case at a term of thirty-four years in the penitentiary system of the Illinois Department of Corrections."

Sanchez was represented by private counsel at trial, and the circuit court appointed the public defender to represent him on appeal.

### Analysis

In this court, Sanchez argues that the circuit court erred in admitting Salazar's testimony regarding his collateral threat to get rid of Mexican immigrants. He also contends that the evidence does not support his murder conviction. Specifically, he asserts that the evidence was insufficient to rebut his self-defense claim; in the alternative, should we deem that claim unreasonable, he urges that the murder conviction be reduced to voluntary manslaughter. Concerning his sentence, Sanchez maintains that he was denied a fair sentencing hearing. And he asserts that his 34-year prison sentence was excessive.

#### THE EVIDENCE ISSUES

█ Taking these points in the foregoing order, we first come to Sanchez's argument that Salazar's testimony regarding his collateral threat was prejudicial and irrelevant to whether he committed murder. The leading case he relies on in support of this proposition is *People v. Lampkin* (1983), 98 Ill. 2d 418, 457 N.E.2d 50. In *Lampkin*, an all-white jury convicted a black defendant of murdering a white Illinois State trooper and sentenced him to death. At trial, a Chicago police officer testified that, in 1973, defendant told him during questioning, "You white honky coppers are [expletive deleted] with us now, and we will get you later." In the supreme court of Illinois, defendant argued that the prejudicial nature of this testimony denied him a fair trial. The supreme court agreed. The court reasoned that to hold admissible a threat made by the defendant against the person actually killed is categorically different from saying that a general threat not directed towards any one person is admissible to show malice and criminal intent. In the case before it, stated the court, there was no indication that the statement at issue meant that violence would be

perpetrated on the person eventually slain. (*Lampkin*, 98 Ill. 2d at 427, 457 N.E.2d at 55.) According to the court, defendant's statement was so general and impersonal that it could not be reasonably characterized as being directed towards anyone in particular. (*Lampkin*, 98 Ill. 2d at 427-28, 457 N.E.2d at 55.) Defendant's statement should have been excluded, the court concluded, because it was irrelevant, it had little or no probative value, and it very likely caused prejudice or hostility on the jury's part. (*Lampkin*, 98 Ill. 2d at 428, 457 N.E.2d at 55.) Therefore, the prejudicial effect of defendant's alleged statement made six years earlier outweighed any probative value the evidence might have had. *Lampkin*, 98 Ill. 2d at 429, 457 N.E.2d at 56.

The facts of our case are not analogous to the facts of *Lampkin*. Sanchez's statement, related by Salazar, to get rid of Mexican immigrants was not as general or impersonal as the statement at issue in *Lampkin*. We cannot say that there is no indication that the statement meant that violence would not be perpetrated on Gentil. Defendant in *Lampkin* made a generally threatening statement regarding all white police officers to a white Chicago police officer, and six years later he killed a white State trooper; here, Sanchez made a threatening statement concerning a small group of Mexican immigrants, and he killed one of the group a few weeks or months thereafter. In short, we think the circuit court properly concluded that whatever prejudicial effect the statement had was outweighed by its probative value.

■ It is also significant that defendant in *Lampkin* was tried before a jury, while Sanchez was tried before a judge. As the State notes, there is a presumption that the trial court considered only competent evidence, although this presumption may be overcome when the record affirmatively shows the contrary. (See *People v. Barbour* (1982), 106 Ill. App. 3d 993, 1001, 436 N.E.2d 667, 673.) In *Barbour*, the trial judge commented at length about improper evidence before finding defendant guilty. Here, in response to Sanchez's objection during the State's rebuttal to his closing argument, the trial judge stated that he did not consider Salazar's testimony "especially relevant." More importantly, the circuit court made no mention of Salazar's testimony when finding defendant guilty. Thus, Sanchez has not overcome the presumption that the circuit court considered only competent evidence.

■ Whether Sanchez has overcome this presumption is closely linked to the question of harmless error. But even if the circuit court improperly admitted Salazar's testimony, or even if Sanchez had overcome the presumption that the circuit court considered only competent evidence, any error that might have occurred regarding her testi-

mony was harmless beyond a reasonable doubt. That is, there is no reasonable possibility that her testimony contributed to his conviction. (See *Barbour*, 106 Ill. App. 3d at 1002, 436 N.E.2d at 674.) Sanchez asserts that the only evidence of animosity was that apparent in the collateral threat related by Salazar. Contrary to Sanchez's assertion, however, there is ample evidence of animosity apart from that evident in her testimony. Mrs. Gentil, Sanchez's cousins, and Sanchez himself testified at length about such animosity. In addition, Sanchez's "T-Bone" story (his second untruthful story, in which he told the police that he asked T-Bone to beat up Gentil because of his problems with the latter) reflects a certain animosity, albeit in the guise of fantasy. Accordingly, there was sufficient evidence, apart from that testified to by Salazar, from which the circuit court could conclude that Sanchez harbored animosity regarding his neighbor.

We now turn to Sanchez's challenge to the sufficiency of the evidence. In the first place, he contends that the evidence was insufficient to rebut his self-defense claim, because there were no eyewitnesses to the incident, because Gentil had shown aggressive behavior in the past, and because the physical evidence was consistent with his explanation of innocence. Sanchez's principal case in support of this point is *People v. Lewellen* (1969), 43 Ill. 2d 74, 250 N.E.2d 651. In that case, the supreme court reversed defendant's voluntary manslaughter conviction on the basis of her self-defense claim. Defendant gave three prior inconsistent explanations for her husband's death. At trial she testified that she killed him in self-defense, by striking and jabbing him with a stick during a struggle. Relying on *People v. Willson* (1948), 401 Ill. 68, 81 N.E.2d 485, the supreme court stated that where the only evidence in a homicide prosecution is circumstantial, the defendant's guilt must be so thoroughly established as to exclude every other reasonable hypothesis. In the case before it, the court ruled, the evidence did not carry with it a reasonable certainty of defendant's guilt. Because a reasonable doubt existed as to whether defendant was not guilty by virtue of acting in self-defense, the court held that the doubt should be resolved in her favor. See *Lewellen*, 43 Ill. 2d at 78, 250 N.E.2d at 654.

However, the reasoning upon which the *Lewellen* court grounded its holding has been undermined by subsequent decisions. In *People v. Pintos* (1989), 133 Ill. 2d 286, 549 N.E.2d 344, for example, defendant claimed that the evidence in a bench trial was not sufficient to support his drug conviction. Defendant argued that as the evidence was entirely circumstantial, it should be reviewed under the reasonable hypothesis of innocence standard. The supreme court rejected

this argument. Citing *Willson* and *Lewellen,* the court acknowledged that the standard of review in cases where the evidence is wholly circumstantial was formerly the reasonable hypothesis of innocence test. (See *Pintos,* 133 Ill. 2d at 291, 549 N.E.2d at 346.) But, the court went on to observe, that test was explicitly rejected in *People v. Eyler* (1989), 133 Ill. 2d 173, 191-92, 549 N.E.2d 268, 276. Consequently, the court concluded that the reasonable hypothesis of innocence standard is no longer viable in Illinois. Instead, the reasonable doubt test of *People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267, should be applied in reviewing the sufficiency of the evidence in all criminal· cases, be the evidence direct or circumstantial. (See *Pintos,* 133 Ill. 2d at 291, 549 N.E.2d at 346.) *Collins* declared that a criminal conviction should not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. See *Collins,* 106 Ill. 2d at 261, 478 N.E.2d at 276.

■■ ■ With this in mind, it is clear that in order to establish his self-defense claim, Sanchez was required to show that unlawful force was used against him, he was not the aggressor, he believed the danger of harm was imminent, force was necessary to avert the danger, and the amount of force used was necessary. (See *People v. Lewis* (1990), 198 Ill. App. 3d 976, 983, 556 N.E.2d 697, 701.) Whether a killing is justified under the law of self-defense is a question of fact to be determined by the trier of fact. (See *People v. Felella* (1989), 131 Ill. 2d 525, 533, 546 N.E.2d 492, 495.) That determination shall not be disturbed on appeal unless the evidence is so unreasonable, improbable, or unsatisfactory as to leave a reasonable doubt of the defendant's guilt. (See *Felella,* 131 Ill. 2d at 533-34, 546 N.E.2d at 495, citing *Collins,* 106 Ill. 2d 237, 478 N.E.2d 267.) Where the evidence at trial is conflicting, the trial judge—who sees and hears the witnesses testify—is entitled to weigh their credibility, draw reasonable inferences from their testimony, and resolve conflicts in the evidence when determining the reasonableness of the defendant's action in killing the deceased. In other words, where the evidence is conflicting, an appellate court should not substitute its judgment for that of the trial judge. See *Felella,* 131 Ill. 2d at 534, 546 N.E.2d at 495-96.

■■ Applying these principles of review to the facts of our case, we conclude that the circuit court did not err in deciding that the State rebutted Sanchez's self-defense claim. Without laboring matters unnecessarily, we do not find the evidence to be so unreasonable, improbable, or unsatisfactory as to leave a reasonable doubt that Sanchez murdered Gentil. The conflicts in the evidence were for the circuit court to resolve. Sanchez's observation that there were no eye-

witnesses rings especially hollow, as we have only his actions to thank for the fact that he was the only witness.

Sanchez also argues, alternatively, that his murder conviction should be reduced to voluntary manslaughter should we deem his self-defense claim (in allegedly grabbing an available blunt object so as to stop an ongoing fight) unreasonable. He cites the cases of *People v. Vaughn* (1975), 26 Ill. App. 3d 247, 324 N.E.2d 697, and *People v. Johnson* (1972), 4 Ill. App. 3d 249, 280 N.E.2d 764, to buttress this argument. In *Vaughn* the evidence established, without conflict, that the defendant was forcibly removed from a VFW hall before he shot the deceased; the evidence in *Johnson* clearly showed that the deceased was the aggressor.

In contrast, the relevant evidence here is conflicting. On the one hand, Sanchez testified that he picked up the pipe, fearing for his life, to ward off Gentil after he was surprised by his neighbor. On the other hand, the State presented evidence showing that it was Gentil who was surprised, because he was found near his locked garage door, with his keys and lunch pail near his hands, and wounds on the back of his head. As the supreme court reasoned in *Felella*, it was for the trial judge to resolve these conflicts.

THE SENTENCING ISSUES

■ Initially, Sanchez maintains that he was denied a fair sentencing hearing, because the circuit court considered the severe financial, personal, and emotional impact of the crime on Gentil's family, including Mrs. Gentil's recommendation that her husband's death be avenged. Section 6 of the Bill of Rights for Victims and Witnesses of Violent Crime Act provides:

"Rights to present victim impact statement. In any case where a defendant has been convicted of a violent crime *** and a victim of the violent crime is present in the courtroom at the time of the sentencing or the disposition hearing, the victim upon his or her request shall have the right to address the court regarding the impact which the defendant's criminal conduct *** has had upon the victim. If the victim chooses to exercise this right, the impact statement must have been prepared in writing in conjunction with the Office of the State's Attorney prior to the initial hearing or sentencing, before it can be presented orally at the sentencing hearing. The court *shall* consider any statements made by the victim, along with all other appropriate factors in determining the sentence of the defendant ***." (Emphasis added.) (Ill. Rev. Stat. 1985, ch. 38, par. 1406.)

In *Booth v. Maryland* (1987), 482 U.S. 496, 96 L. Ed. 2d 440, 107 S. Ct. 2529, the United States Supreme Court held that the presentation of victim impact evidence to a sentencing jury in a capital case is unconstitutional. In *Felella,* the supreme court of Illinois refused to extend the reasoning of *Booth* to noncapital cases. See *Felella,* 131 Ill. 2d at 535-36, 546 N.E.2d at 496.

■ In the wake of *Felella,* Sanchez is left with his theories that, first, section 6 does not permit the introduction of a victim impact statement where the victim (here Mrs. Gentil) does not testify at the sentencing hearing, and, second, that the circuit court improperly relied on Mrs. Gentil's emotional comments in her written statement. Concerning Sanchez's first theory, we note that his trial counsel did not raise it at the sentencing hearing. But even if this point were properly preserved for review, we find nothing in the text of section 6 which mandates that a victim testify at the sentencing hearing in order for her written impact statement to be admissible. Rather, as we read section 6, it grants a victim the right to address the court during the sentencing hearing if she elects to do so and then requires that a written impact statement be prepared in advance of the hearing at which she will testify.

In *People v. Wallace* (1988), 170 Ill. App. 3d 329, 524 N.E.2d 677, defendant argued that the circuit court erred in allowing the prosecutor to read the victim's letter into evidence although she was not present in the courtroom. According to defendant, the plain language of the Act required the victim to be present before her impact statement could be considered. Defendant contended that the victim's presence would ensure the reliability of her statement and that her absence denied him the constitutional right to confront his accuser. The appellate court rejected these arguments. The court stated that a defendant already adjudged guilty does not have the right to cross-examine all out-of-court sources relied upon in sentencing. (See *Wallace,* 170 Ill. App. 3d at 333, 524 N.E.2d at 679.) In fact, the court noted, hearsay evidence may be considered at a sentencing hearing. Moreover, the court concluded, Illinois has mandated as a matter of policy that a crime's impact on the victim be considered. (See *Wallace,* 170 Ill. App. 3d at 334, 524 N.E.2d at 679-80.) In *People v. Fields* (1990), 198 Ill. App. 3d 438, 441-42, 555 N.E.2d 1136, the court rejected similar arguments. We readily conclude, then, that Mrs. Gentil was not required to testify at Sanchez's sentencing hearing in order for her written victim impact statement to be admitted or considered.

■ We likewise reject Sanchez's second theory, namely, that the circuit court erroneously considered the emotional comments in Mrs.

Gentil's victim impact statement. He makes much of the following remarks of the circuit court, which were made during the sentencing hearing:

> "Well, I understand that this is the statement of a member of the victim's family who has very deep feelings."

Sanchez refuses to acknowledge, however, that these remarks must be read in context. The circuit court made them in response to his objection that the statement included prejudicial comments from Mrs. Gentil. We understand the circuit court to be saying that it realized the emotional nature of some of her comments, and that it would not be unduly swayed by them. Similarly, when the circuit court stated that it took the victim impact statement into consideration in imposing sentence, it was doing no more than the text of section 6 mandates. In *Fields*, the appeals court refuted defendant's argument that a written victim impact statement from the mother of the woman he murdered was improperly admitted. The reviewing court relied on the presumption that the trial judge recognized and disregarded any incompetent evidence during sentencing. (See *Fields*, 198 Ill. App. 3d at 441, 555 N.E.2d at 1139.) Here, Sanchez has not rebutted this presumption to our satisfaction.

Finally, we come to Sanchez's objection to the length of his 34-year sentence. He asserts that this severe sentence was an abuse of discretion, as he had no prior criminal record, as there was evidence that he acted in self-defense, and as there were no aggravating circumstances not inherent in the offense itself. At the time Sanchez was sentenced, the statutory range for murder was 20 to 40 years in prison. Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1).[2]

▬ The principles that govern our resolution of this question are not controversial. Imposition of sentence is a matter within the purview of the circuit court, and its decision is entitled to great deference and weight. A sentence within the statutory range described for the offense will not be disturbed on review absent an abuse of discretion. (See *People v. Lewis* (1989), 191 Ill. App. 3d 155, 162, 547 N.E.2d 599, 603.) In setting forth the reasons for the sentence imposed, the court need not recite and assign a value to each fact presented at the hearing. And, it is presumed that the court considered all evidence offered in mitigation absent some statement to the contrary. (See *People v. Crews* (1989), 191 Ill. App. 3d 228, 236, 547 N.E.2d 580, 586.) Nothing in the sentencing guidelines prohibits the

---

[2]The statutory range for first-degree murder is now 20 to 60 years in prison. See Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—1(a)(1).

circuit court from considering the brutal or heinous character of defendant's conduct when evaluating a nonextended-term sentence. See *People v. Duncan* (1990), 196 Ill. App. 3d 343, 346, 553 N.E.2d 774, 776-77.

■■■ Given the deferential standard of review and the facts of this case, we cannot say that the circuit court abused its discretion in imposing a 34-year sentence. We refuse to overturn a midrange sentence imposed upon a trespasser who—as he himself admitted—mortally wounded an unarmed neighbor by hitting him more than once in the head with a pipe, and then hid the weapon after leaving his victim to die. Compare *People v. Hood* (1989), 191 Ill. App. 3d 129, 136, 547 N.E.2d 637, 643 (appellate court concludes that defendant's 30-year murder sentence was not an abuse of discretion, where she repeatedly stabbed an intoxicated man she did not fear and could have rebuffed without a knife).

## CONCLUSION

For the reasons stated, we hold that Sanchez was properly convicted of murder and that he was properly sentenced to 34 years in the Department of Corrections.

Affirmed.

GORDON and LORENZ, JJ., concur.